1    DANIEL C. DECARLO, SB# 160307
       E-Mail: decarlo@lbbslaw.com
2    ROBERT M. COLLINS, SB# 254915
       E-Mail: rcollins@lbbslaw.com
3    **LEWIS BRISBOIS BISGAARD & SMITH LLP**
     221 North Figueroa Street, Suite 1200
4    Los Angeles, California  90012
     Telephone: 213.250.1800
5    Facsimile: 213.250.7900

6    Attorneys for EWI WORLDWIDE

7

REDACTED

8                  UNITED STATES DISTRICT COURT

9       CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

10

11   PREMIER DISPLAYS & EXHIBITS,          CASE NO. SACV-09-00354JVS (ANx)
     INC., a California corporation,
12                                          The Honorable James V. Selna
                 Plaintiff,
13                                          **DECLARATION OF ROBERT M.
          v.                                COLLINS IN SUPPORT OF
14                                          DEFENDANT EWI
     DAVID COGSWELL; an individual;         WORLDWIDE'S MOTION FOR
15   COGSWELL DESIGN, INC., a               SUMMARY JUDGMENT OR IN
     California corporation; DISPLAY        THE ALTERNATIVE
16   FABRICATION GROUP, INC., a             ADJUDICATION OF ISSUES**
     California corporation; EWI
17   WORLDWIDE, aka, PRESENTATION
     WORKS, INC., aka EXHIBITS              TRIAL DATE:    February 23, 2010
18   WORKS, INC., a Michigan
     corporation, and DOES 1 through 50,
19   inclusive,                             **[FILED UNDER SEAL PURSUANT
                                            TO SEPTEMBER 25, 2009, ORDER
20               Defendants.                RE DESIGNATION AND
                                            HANDLING OF CONFIDENTIAL
21                                          MATERIALS]**

22

23

24

25

26

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1    I, Robert M. Collins, declare as follows:

2    1.    I am an associate of Lewis Brisbois Bisgaard and Smith, LLP, attorney

3    of record for Defendant EWI Worldwide ("EWI"). I am one of the attorneys

4    responsible for handling this matter. As such, I make all the following statements

5    based upon my personal knowledge.

6    2.    Attached hereto as Ex. "A" are true and correct excerpts of the

7    November 19, 2009, Federal Rule of Civil Procedure Rule 30(b)(6) deposition of

8    Plaintiff Premier Displays & Exhibits, Inc (hereinafter "Premier").

9    3.    Attached hereto as Ex. "B" are true and correct excerpts of Premier's

10   Responses to Defendant David Cogswell's First Set of Interrogatories with non-

11   relevant, confidential portions redacted.

12   4.    Attached hereto as Ex. "C" is a true and correct copy of Premier's

13   Second Amended Complaint filed on August 6, 2009.

14   5.    Attached hereto as Ex. "D" are true and correct excerpts of the August

15   12, 2009, deposition of David Cogswell.

16   6.    Attached hereto as Ex. "E" is a true and correct copy of Premier's

17   "Employee Orientation Handbook", produced to EWI Worldwide by Premier and

18   identified by Stephen Amato at the November 19, 2009, Federal Rule of Civil

19   Procedure Rule 30(b)(6) deposition of Premier, and marked as Ex. "43" at said

20   deposition.

21   7.    Attached hereto as Ex. "F" is a true and correct copy of Premier's

22   Responses to EWI Worldwide's First Set of Interrogatories.

23   8.    Attached hereto as Ex. "G" is a true and correct copy of the relevant

24   excerpts of a letter sent to me from counsel for Premier, Laura Knox-Raphael, Esq.,

25   on November 9, 2009.

26   / / /

27   / / /

28   / / /

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1      9.      I declare under penalty of perjury under the laws of the State of

2    California that the foregoing is true and correct.  Executed this 25th day of

3    November 2009, at Los Angeles, California.

4

5

6                                                        Robert M. Collins

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LEWIS
BRISBOIS
BISGAARD
SMITH LLP
ATTORNEYS AT LAW

**EXHIBIT A**



Redacted



Redacted



Redacted



Redacted



Redacted



Redacted



Redacted



Redacted



Redacted



Redacted



Redacted



Redacted



Redacted



Redacted



Redacted



Redacted

**EXHIBIT B**

THE KNOX-RAPHAEL LAW FIRM
Laura Knox-Raphael (S.B.N. 130334)
9210 Irvine Center Drive
Irvine, CA 92618
(949) 660-1609

Attorney for PREMIER DISPLAYS & EXHIBITS, INC.,
A California Corporation.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PREMIER DISPLAYS & EXHIBITS, INC., A California Corporation, | CASE NO.: SACV09-354JVS (ANx) |
| Plaintiff, | |
| vs. | PLAINTIFF'S RESPONSES TO DEFENDANT DAVID COGSWELL'S FIRST SET OF SPECIAL INTERROGATORIES |
| DAVID COGSWELL, An Individual; COGSWELL DESIGN, INC., A California Corporation; DISPLAY FABRICATION GROUP, INC., A California Corporation; EWI WORLDWIDE, aka, PRESENTATION WORKS, INC., aka EXHIBITS WORKS, INC., A Michigan Corporation, and DOES 1 through 50, inclusive, | |
| Defendants. | |

PROPOUNDING PARTY:      Defendant, DAVID COGSWELL.

RESPONDING PARTY:       PREMIER DISPLAYS & EXHIBITS, INC., A California Corporation.

SET NO.:                ONE (1)

THE KNOX RAPHAEL
LAW FIRM

1

## RESPONSES TO SPECIAL INTERROGATORIES (SET ONE)

### INTERROGATORY NO. 1:

"IDENTIFY each and every ITEM YOU allege David Cogswell misappropriated."

### RESPONSE TO INTERROGATORY NO. 1:

Shortly after March 21, 2008, Plaintiffs' principals, including Stephen Amato, discovered e-mails set by David Cogswell on or about March 21, 2009, which had been sent to Carter Lee, at EWI a competitor of the Plaintiff without the knowledge or consent of Premier. These designs, identified as Exhibits 9 and 11 of Volume 2 of Mr. Cogswell's deposition taken in this case, included sketches representing a proposed design for the Walt Disney Blue Sky Cellar. Mr. Cogswell had created these designs at some point in time prior to the May 21, 2008 transmission of these e-mails to EWI. The e-mails and attached sketches had also been copied to Tracy Cogswell, David Cogswell's wife, who was then known to be within upper management at EWI. When Mr. Amato confronted Mr. Cogswell with this discovery, Mr. Cogswell admitted that he had created these sketches during his full-time employment for Premier, and that he had in fact sent them to Carter Lee and to his wife, at EWI. At the time these sketches were created (including the second "pantone" sketch claimed to have been done on March 22, 2009), Mr. Cogswell was a full time salaried employee of Premier. The Walt Disney Company and Walt Disney Imagineering were also existing clients of Premier at that time. Accordingly, Mr. Cogswell's acts of furnishing the sketches at issue to EWI, was to assist a known competitor in gaining employment for profit with one of Premier's existing clients, to Premier's determine, a clear conflict of interest on the part of Mr. Cogswell.

Plaintiff contends Cogswell misappropriated designs for two other projects, including the Jezign shoebox and the NYKO displays he described in his deposition. The e-mails from December, 2007 and January, 2008, produced at Cogswell's deposition and acknowledged by Cogswell prove that Cogswell conceived the basic design for a transparent self-illuminated shoe box display for use at retail stores while at Premier. Work on the project ceased until Jezign paid Premier for the work Premier had paid Cogswell to do on the project. After his

termination, Cogswell immediately took the designs he commenced while at Premier and completed them for Jezign paying himself monies that essentially were owed to Premier. Jezign was a client of Premier at the time Mr Cogswell was terminated.

As for the NYKO Displays, Mr. Cogswell testified at his deposition that these were turned out within weeks of his termination by Premier. However, Cogswell also testified that the lead time required for such displays was normally in the nature of months. The fact that Cogswell turned them out in far less time than he testified were usually required, coupled with Cogswell's other acts of disloyalty to Premier, give rise to a reasonable inference that he had secretly begun work on the NYKO displays while still at premier, and then completed them promptly after his termination.    Such inferential/circumstantial evidence is equally as probative and admissible as direct evidence, as a matter of law.

During his deposition Mr. COGSWELL also further admitted that he had secretly downloaded, without Premier's consent,  onto a thumb drive, a list of Premier's clients and pertinent secret information pertaining thereto, which was a further clearly and willful violation of Plaintiff's employment rules and regulations.

Finally, Mr. Cogswell also admitted that he had wiped clear the hard-drive of the laptop computer, which Plaintiff contends was an intentional spoliation of evidence and was yet another willful and deliberate violation of Premier's employment rules and regulations. It is presently unknown whether such intentional spoliation of evidence by Mr. Cogswell was intended to conceal other acts of misappropriation, and Plaintiff's investigation and discovery are continuing.

## INTERROGATORY NO. 2:

"IDENTIFY each and every ITEM YOU allege David Cogswell misappropriated which constitutes a trade secret of PREMIER."

## RESPONSE TO INTERROGATORY NO. 2:

Plaintiff incorporates its response to Interrogatory No. 1, above. All of the aforementioned misappropriations were of Premier's trade secrets.

## INTERROGATORY NO. 3:

As EWI's Tracy Cogswell admitted in an e-mail dated June 16, 2009, a few days before EWI was to make its bid proposal to WDI, "at this point [Monday, March 17, 2009], it was decided by team leadership (Tony Zorilla, Angela Delatore) that it would be ideal to have a sketch version of one of the renderings." (EWI 003370). After David Cogswell submitted his black and white sketches to EWI on March 19, 2009 they were reviewed by EWI's leadership team. According to Mrs. Cogswell's aforementioned e-mail, "David's rough sketches [were] reviewed, and as no other sketch artist had been commissioned, David was invited by team leadership to volunteer a finished sketch." That sketch was done by Mr. Cogswell with pantone markers and sent to EWI on or about March 22, 2009. (EWI 003371).

EWI has admitted it had no other qualified sketch artists able to prepare the final Cogswell sketch, so it instead employed Premier's sketch artist (David Cogswell) on short notice to work for EWI.

That the final sketch had considerable potential economic value to EWI is exemplified by the facts that: (1) The bid proposal and contract called for such a sketch to describe the scope of work thereunder; (2) EWI determined it could not and/or would not submit its final bid without that sketch and that it was important to do so, even on the eve of the bid's submission; (3) EWI won the bid for a ███████████████████ with WDI while using the Cogswell sketch; (4) the Cogswell sketch was the only artistic rendering submitted by EWI to WDI as part of the completed bid package; (5) the Cogswell pantone sketch became a part of both the graphic "Creative Treatment" portion of EWI's bid to Disney, and also thereafter was made a part of the comparatively abridged "Creative Treatment - Revision 1" final conceptual package submitted to Disney in April, 2008, after EWI had already won the bid award for the Blue Sky Cellar; (6) both EWI and Disney thereafter made the final Cogswell pantone sketch a permanent part of the formal contract itself, as part of the 16-page final Creative Concept Package attached as Exhibit "C" thereto; (7) Disney and WDI thereafter circulated the Cogswell pantone sketch to the print and web media as the official artistic rendering of the Blue Sky Cellar, and the sketch was featured in several newspapers and their websites, including the Los Angeles Times on [date]. This evidence evinces WDI's

1 | ownership of work created by employees of PREMIER."

2 | **RESPONSE TO INTERROGATORY NO. 24:**

3 |  Plaintiff incorporates its response to Interrogatory No. 19, above.

4 | ///

5 | DATED:      Nov. 7, 2009

THE KNOX-RAPHAEL LAW FIRM

By _____
    LAURA KNOX-RAPHAEL,
    Attorneys for Plaintiff.

PLAINTIFF'S RESPONSES TO DAVID COGSWELL'S SPECIAL INTERROGATORIES, SET ONE

## PROOF OF SERVICE

Premier Displays & Exhibits, Inc. v. Cogswell, et al.
United States District Court
Central District of California Case No. SACV09-354JVS (ANx)

I am a resident of and employed in the aforesaid county, State of California; I am over the age of eighteen years and not a party to the within action; my business address is 9210 Irvine Center Drive, Irvine, California.

On Nov. 9, 2009, I caused to be served the foregoing **PLAINTIFF'S RESPONSES TO FIRST SET OF INTERROGATORIES OF DEFENDANT DAVID COGSWELL** upon the interested parties in this action:

(X)     **BY FIRST-CLASS MAIL,** to:

John Selbak, Esq.                                          Counsel for Defendants, DAVID
CORPORATE COUNSEL PARTNERS  COGSWELL and COGSWELL DESIGN,  INC.
35 North Arroyo Parkway, Suite 240
Pasadena, CA 91103
Telephone: (626) 689-4383
Facsimile: (626) 243-4813
Email:     JSelbak@corporate-counsel.net

Daniel C. DeCarlo, Esq.
Robert M. Collins, Esq.                                    Counsel for Defendant, EWI
LEWIS, BRISBOIS, BISGAARD & SMITH, LLP          WORLDWIDE, aka, PRESENTATION
221 North Figueroa Street, Suite 1200                      WORKS, INC., A Michigan Corporation.
Los Angeles, CA  90012
Telephone: (213) 250-1800
Facsimile: (213) 250-7900
Email:     ddecarlo@lbbslaw.com
           Rcollins@lbbslaw.com

( )     **BY OVERNIGHT PRIORITY MAIL WITH NEXT DAY DELIVERY GUARANTEED** by placing a true copy thereof, in a sealed envelope to the addressee(s) ABOVE, and depositing the same into the **OVERNITE EXPRESS** mail drop at the address located set forth hereinabove, with postage prepaid.

( )     **BY MAIL,** by placing a true copy thereof, in a sealed envelope to the addressee(s) below, and depositing the same into the United States mail at the address located set forth hereinabove, with sufficient first-class postage thereon prepaid:

( )     **BY PERSONAL SERVICE,** by personally delivering a sealed envelope, containing the above-referenced notice to the addressee(s) listed below:

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Dated:          November 9, 2009

LAURA KNOX-RAPHAEL

THE KNOX RAPHAEL
LAW FIRM

14

PLAINTIFF'S RESPONSES TO DAVID COGSWELL'S SPECIAL INTERROGATORIES, SET ONE

**EXHIBIT C**

1  THE KNOX-RAPHAEL LAW FIRM
2  LAURA KNOX-RAPHAEL (SBN 130334)
   9210 IRVINE CENTER DRIVE
3  IRVINE, CALIFORNIA 92618
   PHONE: (949) 660-1609
4  FACSIMILE: (949) 660-1647
   EMAIL ADDRESS: LKNOX@KNOXRAPHAEL-LAW.COM

5
6  Attorneys for Plaintiff PREMIER DISPLAYS & EXHIBITS, INC., A California Corporation

7

8

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11

12  PREMIER DISPLAYS & EXHIBITS,          CASE NO.: SACV09-0354JVS(AnX)
    INC., A California Corporation,
13                                         SECOND-AMENDED COMPLAINT OF
                      Plaintiff,           PLAINTIFF PREMIER DISPLAYS &
14                                         EXHIBITS, INC. FOR:
15           vs.                           1.  COPYRIGHT INFRINGEMENT;
16                                         2.  MISAPPROPRIATION OF TRADE
    DAVID COGSWELL, An Individual;             SECRETS (Civ.C. § 3426, et seq.);
17  COGSWELL DESIGN, INC., A
    California Corporation; DISPLAY        AND DEMAND FOR JURY TRIAL.
18  FABRICATION GROUP, INC., A
    California Corporation; EWI
19  WORLDWIDE, aka, PRESENTATION
    WORKS, INC., aka EXHIBITS WORKS,
20  INC., A Michigan Corporation, and
    DOES 1 through 50, inclusive,
21
                      Defendants.
22

23

24

25       COMES NOW, Plaintiff PREMIER DISPLAYS & EXHIBITS, INC., A California

26  Corporation, and for causes of action against Defendants and each of them, hereby

27  complains of Defendants and each of them, as follows.

28                       GENERAL ALLEGATIONS

                                    1

1.     This is an action for damages and injunctive relief. There is also no claim for fraud or mistake pleaded herein by Plaintiff which might otherwise trigger any of the "particularity" pleading requirements of Fed.R.Civ.P. Rule 9(b).

2.     Plaintiff PREMIER DISPLAYS & EXHIBITS, INC., A California Corporation (hereinafter "Plaintiff" or "Premier"), is a corporation duly organized and existing under the laws of the State of California, with a principal place of business in the City of Cypress, County of Orange, State of California.

### PARTIES

3.     At all times herein mentioned, Defendant DISPLAY FABRICATION GROUP, INC., A California Corporation (hereinafter "DFGI"), was and is a corporation duly organized and existing under the laws of the State of California, with a principal place of business in the City of Cypress, County of Orange, State of California.

4.     At all times herein mentioned, Defendant DAVID COGSWELL (hereinafter "Cogswell") was and is an individual and a resident of the County of Orange, State of California.

5.     At all times herein mentioned, Defendant COGSWELL DESIGN, INC., A California Corporation (hereinafter "Cogswell Design"), was and is a corporation duly organized and existing under the laws of the State of California, with its principal place of business in the City of Orange, County of Orange, State of California.

6.     At all times herein mentioned, Defendant EWI WORLDWIDE, aka, PRESENTATION WORKS, INC., aka EXHIBITS WORKS, INC. (hereinafter "EWI"), A Michigan Corporation, was and is a corporation duly organized and existing under the laws of the State of Michigan, which has not qualified to do business and has been doing business within the State of California, with a principal place of business in California in the City of Foothill Ranch, County of Orange, State of California.

7.     Plaintiff is presently ignorant of the true names and capacities of the

2

1   Defendants sued herein as DOES 1 to 50, and therefore sues these Defendants by
2   such fictitious names. Plaintiff will amend this Complaint to allege the true names
3   and capacities when that information is ascertained.   Plaintiff is informed and
4   believes and, based on that information and belief, alleges that each such fictitiously
5   named Defendant is legally responsible in some manner for the occurrences alleged
6   herein, and that Plaintiff's injuries and damages were proximately caused by each
7   such Defendant's actions.

8       8.       Plaintiff is informed and believes and, based on this information and
9   belief, alleges that Defendants, and each of them, were the agents, servants and
10  employees of their Co-Defendants, and in doing the things herein alleged were acting
11  within the course, scope, purpose, and authority of such agency and employment with
12  the full knowledge, permission and consent of each of their co-Defendants.

13      9.       Plaintiff is informed and believes, and based thereupon alleges that at all
14  times mentioned herein each of the Defendants, including Defendant Does 1 through
15  50, inclusive, and each of them were the agents, servants, employees, representatives
16  of each of the remaining Defendants and were at all times material hereto acting
17  within the authorized course and scope of said agency, service, employment and/or
18  representation, and/or that all of said acts, conduct and omissions were subsequently
19  ratified by their respective principals and the benefits thereof accepted by such
20  principals.  Plaintiff further is informed and believes and thereon alleges that all of
21  the Defendants conspired to commit the acts and omissions complained of herein as
22  part of a common plan and design to benefit the Defendants, and each Defendant
23  further committed one or more acts or omissions in furtherance thereof, as a legal
24  result of which Plaintiff sustained damages and injury as further alleged herein.

25                          JURISDICTION AND VENUE

26      10.      This action consists of claim for copyright infringement arising under the
27  Copyright Act of 1976, 17 U.S.C. § 101, et seq., as a result of which this Court has
28  original subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 and

1  1338(a). In addition to copyright infringement, this action also includes causes of

2  action under California state law and this Court has supplemental jurisdiction over

3  California state law claims pursuant to 28 U.S.C. § 1367(a).

4      11.    Venue in this District is proper pursuant to 28 U.S.C. § 1391 and 1400(a).

<u>THE COPYRIGHTED WORKS</u>

5

6      12.    The copyrighted works at issue in this complaint consist of the following:

7  (A) nine (9) photographs authored by Padgett and Company, Inc. of Chicago, Illinois,

8  and exclusively licensed to Plaintiff, consisting of photographs of trade show displays

9  and exhibits designed and manufactured by Plaintiff for its clients Nike/Brand Jordan

10  ("Nike") and Spyder Active Sports ("Spyder") (Exhibit 1 hereto); (B) sixteen (16)

11  photographs authored by Plaintiff consisting of photographs of trade show displays

12  and exhibits designed and manufactured by Plaintiff for its clients The Walt Disney

13  Company for Buena Vista Games, Inc. ("BVG"), LucasArts, Epson America, Inc.

14  ("Epson"), NYKO Technologies, Inc. ("NYKO"), Jezign, The Ultra Productions and the

15  California Avocado Commission (Exhibit 2); and ( c) a three-dimensional video

16  animated presentation of aggregated displays and exhibits designed and

17  manufactured by Plaintiff for its client BVG (a disk of which is attached hereto as

18  Exhibit 3). (hereinafter collectively referred to as "Copyrighted Works"). Plaintiff

19  possesses a written, exclusive license issued by Padgett and Company, Inc. to use

20  those nine (9) photos among the Copyrighted Works identified as Exhibit 1. The

21  Copyrighted Works were taken/prepared between 2004 and 2008, and compiled in an

22  online catalogue for future use in an internet catalogue during the period from 2004

23  through 2008. The nine (9) photographs attached as Exhibit 1 were duly registered

24  with the U.S. Copyright Office effective March 5, 2009 and bear the registration

25  number VAU 979-726. The sixteen (16) photographs attached as Exhibit 2 were duly

26  registered with the U.S. Copyright Office effective March 5, 2009 and bear the

27  registration number VAU 979-727. The video attached as Exhibit 3 was duly

28  registered with the U.S. Copyright Office effective April 9, 2009 and bears the

4

1  registration number PAU 338-1310. True and correct copies of said registration

2  certificates are attached hereto as Exhibits 4 through 6, respectively.

3  <u>ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF</u>

4  13. At all times herein mentioned, Plaintiff Premier is a designer, producer,

5  manufacturer, industrial retailer and logistical manager of custom displays and

6  exhibits for use by the nation's Fortune 500 corporations at public and industry trade

7  shows throughout the world, in retail and/or corporate environments and/or in

8  museums, attractions and themed environments, for the purposes of displaying their

9  products and services. Such customers of Premier include, but are not limited to,

10 Nike, Epson, The Walt Disney Company, Walt Disney Imagineering, Buena Vista

11 Games (a division of the Walt Disney Company), LucasArts, Spyder, Jezign and

12 NYKO.

13 14. At all times herein mentioned, Defendants Cogswell, DFGI, EWI, and

14 DOES 1 through 50, inclusive, were and are business competitors of the Plaintiff both

15 locally and worldwide.

16 15. On or about November 23, 2004, Plaintiff and Defendant Cogswell

17 ("Cogswell") entered into a written employment agreement (hereinafter "Employment

18 Contract") by and through which Cogswell was hired as a full time salaried employee

19 of Premier, with the title of Creative Designer/Account Manager, to act as a designer

20 of custom displays and exhibits for Premier for retail sale to Premier's industrial

21 customers. The agreement provided, inter alia, that Cogswell "would abide by all

22 rules and regulations of the employer" as set forth, inter alia, in Premier's "Employee

23 Orientation Handbook." The Employee Orientation Handbook in turn provided, inter

24 alia, that any and all intellectual property of Premier furnished to Cogswell was solely

25 provided by Premier's at its discretion to assist in Defendant Cogswell's performance

26 of his employment for Premier, and that any other use or removal of such intellectual

27 property of Premier, including "data, drawings, designs, plans, software, images or

28 confidential material" from Premier's premises "was strictly forbidden without

1  management's approval." The Employee Orientation Handbook further provided that

2  "information on the Company's production methods, production rates, and new

3  product ideas would be very helpful to any competitor and not in our best interests."

4  While the Employee Orientation Handbook provided that work outside Defendant

5  Cogswell's regular full-time employment was not prohibited, any such outside work

6  that was harmful to the Company's best interests or which presented a current or

7  potential future conflict of interest with his employment for Premier, including

8  working for competitors of Premier without management notification and consent in

9  advance, was prohibited. The Employee Orientation Handbook further provided that

10  "[t]he use of the Company's internet access for personal gain or for non-job related

11  activities is strictly forbidden." The Employee Orientation Handbook further provided

12  that "[t]heft or unauthorized use of Company property" constituted grounds for

13  discipline, including termination for cause.

14    16.    Implied in the Employment Contract was a covenant of good faith and fair

15  dealing whereby each of the parties agreed that they would do nothing to interfere

16  with the rights of the other parties to receive the fruits of the benefits of said written

17  contract.

18    17.    During the full-time employment of Defendant Cogswell, Defendant

19  Cogswell was furnished by Plaintiff with substantial intellectual property, resources,

20  designs, templates, ideas, equipment, and tools of Premier (including but not limited

21  to the Copyrighted Works), as well as unfettered access to Premier's customer and

22  clients lists and access to the Clients themselves (hereinafter "trade secrets"); in order

23  to assist Defendant Cogswell in the performance of Cogswell's full-time employment

24  for Premier.

25    18.    Such trade secrets derived independent economic value from not being

26  generally known to the public or to others who could obtain economic value from their

27  disclosure or use and were the subject of efforts that were reasonable under the

28  circumstances to maintain their secrecy. As set forth above, Defendant Cogswell's

6

1  continuing employment with Plaintiff was contingent upon Defendant Cogswell's

2  maintaining the secrecy and confidentiality of said trade secrets and not disclosing

3  or using such trade secrets for the benefit of Plaintiff's competitors.

4      19.    Prior to April 1, 2008, Plaintiff had performed all terms, conditions and

5  covenants, required to be performed on its part under the Employment Contract,

6  except as to those terms, conditions and covenants, which had been waived, excused

7  and/or discharged.

8      20.    On April 1, 2008, Plaintiff Premier terminated the employment of

9  Defendant Cogswell for cause after Plaintiff discovered that Defendant Cogswell had

10  been secretly working, without advance notice or consent of Plaintiff Premier, for

11  competitors of Premier, including but not limited to Defendants EWI, and DOES 1

12  through 50, inclusive, while Defendant Cogswell's wife was employed for Defendant

13  EWI at that time, enabling Defendant EWI to sell competing designs and displays to

14  The Walt Disney Company and its affiliate Walt Disney Imagineering, active clients

15  of Plaintiff Premier, using Premier's intellectual property misappropriated by

16  Defendant Cogswell. Unbeknownst to Plaintiff at that time, Defendants Cogswell and

17  DOES 1 through 20, inclusive, had also secretly downloaded, expropriated and

18  misappropriated, for their own purposes in competing against Premier, the

19  Copyrighted Works, Plaintiff's trade secrets, as well as other designs, drawings, and

20  intellectual property of Premier, as well as customer and vendor lists of Premier, all

21  of which were the sole and exclusive intellectual property and trade secrets of

22  Premier, without prior notice to or the consent of Premier, in violation of the express

23  terms of the Employment Contract. The foregoing acts of secret competition by

24  Defendants Cogswell and Cogswell Design, and each of them as against Premier, as

25  well as acts of expropriation and misappropriation of the Copyrighted Works, trade

26  secrets, as well as other aforementioned intellectual property and customers and

27  vendor lists of Premier by Defendants Cogswell and Cogswell Design, were a material

28  breach of the Employment Contract, and of the covenant of good faith and fair dealing

7

1   implied therein.

2       21.    Shortly after April 1, 2008, Plaintiff Premier discovered that Defendants
3   Cogswell and DOES 1 through 25, inclusive, had established designer/member pages
4   on internet websites styled "coroflot.com", and "linkedin.com" in which Defendant
5   Cogswell set forth therein and interlinks to Defendant Cogswell's own websites, and
6   in which Defendants Cogswell, Cogswell Design, and DOES 1 through 25, and each
7   of them publicly displayed the Copyrighted Works falsely asserting, both expressly
8   and impliedly, that the contents of the Copyrighted Works originated with and were
9   owned by Defendants Cogswell, Cogswell Design, and DOES 1 through 25, and each
10  of them.

11      22.    The contents of the aforementioned website pages and interlinked
12  websites further contained alleged "testimonials" from clients of Plaintiff, which were
13  false and deceptive to the public, and in some cases were outright fabrications.

14      23.    On May 28, 2008, by and through its counsel of record at the time,
15  Plaintiffs demanded in writing that Defendants Cogswell and Cogswell Design cease
16  and desist using the Copyrighted Works and making other false statements in these
17  online website pages and links thereto.

18      24.    In response to the May 28, 2008 cease and desist letter, Defendants
19  Cogswell and Cogswell Design did in fact remove the Copyrighted Works, and false
20  and misleading testimonials from the internet websites styled "coroflot.com", and
21  "linkedin.com" as demanded by Plaintiff.

22      25.    On or about June 12, 2008, Defendant Cogswell incorporated and
23  established Defendant Cogswell Design.  The portfolio screen for Defendant Cogswell
24  Design's website boasts of having worked on design projects that include trade show
25  exhibits, theme park attractions, etc.   The website for Defendant Cogswell Design
26  further reflects a reposting of all of the Copyrighted Works as to which Defendants
27  and each of them have asserted authorship and ownership , and false and misleading
28  testimonials, and press about said Copyrighted Works.

8

26.     In or about January, 2009, Plaintiff discovered that Defendant Cogswell had restored all of the aforementioned offending and misleading website pages and links to Defendant Cogswell Design's website reposting all of the Copyrighted Works as to which Defendants and each of them have asserted authorship and ownership, and false and misleading testimonials, and press. The outright and implied misrepresentation(s) of the identity of alleged clients of Defendant Cogswell and Defendant Cogswell Design and alleged projects designed by Defendants Cogswell and Cogswell Design are intended to garner and steal existing clients and/or commerce from Plaintiff as upcoming annual trade shows, involving Plaintiff's customers, are rapidly approaching, including but not limited to, the June 2 - 4, 2009 Electronic Entertainment Expo at the Los Angeles Convention Center, and the July 23 - 26, 2009 Comic-Con International at the San Diego Convention Center, and the August 31, 2009 through September 2, 2009 MAGIC Apparel Show in Las Vegas, Nevada.

27.     Within one year prior to the filing of this action, Plaintiff further discovered that Defendant Cogswell had misappropriated certain trade secrets, as alleged hereinbelow, from the Plaintiff and has himself exploited and furnished such trade secrets to other competitors of the Plaintiff for use and exploitation in commerce and direct competition against Plaintiff including, but not limited to, Defendants Cogswell Design, DFGI, EWI , and DOES 1 through 50, inclusive.

<u>FIRST CLAIM FOR RELIEF</u>

(Copyright Infringement Against Defendants COGSWELL, COGSWELL DESIGN, and DOES 1 through 25, Inclusive, Only)

28.     Plaintiff realleges and incorporates by reference each of the allegations of paragraphs 1 through 27, above, as though fully set forth herein.

29.     Defendants and each of them have published online catalogues promoting and displaying the copyrighted works of Plaintiff.

30.     By letter dated May 28, 2007 (Exhibit 7) Plaintiff demanded, inter alia, that Defendants and each of them cease and desist in the use of the Copyrighted

9

1   Works on their websites. After briefly removing the Copyrighted Works, Defendants
2   and each of them restored to their websites the Copyrighted Works without notice to
3   Plaintiff and without Plaintiff's consent. Defendants and each of them have thus
4   willfully infringed upon and continue willfully to infringe upon, the Copyrighted
5   Works pursuant to 17 U.S.C. § 101, et seq.

6       31.    Plaintiff is informed and believes that Defendants and each of them
7   through (a) their right and ability to supervise the infringing conduct; and (b) their
8   obvious and direct financial interests in the exploitation of the Copyrighted Works,
9   are vicariously liable for the unlawful infringing conduct of each of the other
10  Defendants and each third party as alleged hereinabove.

11      32.    Plaintiff is further informed and believes that Defendants, acting with
12  knowledge of infringing activity, induced, caused, or materially contributed to the
13  infringing activity and is contributorily liable for the unlawful infringing conduct of
14  each of the other Defendants and each third parties as alleged hereinabove.

15      33.    As a direct and legal result of the Defendants' infringement, Plaintiff has
16  suffered actual and statutory damages and lost profits in an amount which is
17  presently unknown, but which shall be determined according to proof at trial,
18  pursuant to 17 U.S.C. § 504.

19      34.    The Defendants' acts of infringement are further causing irreparable
20  injury to Plaintiff and thus Plaintiff is thus entitled to temporary, preliminary, and
21  permanent injunctive relief injunctive relief restraining the Defendants and each of
22  them, as well as their officers, agents, employees, and all other persons acting in
23  concert with them, from engaging in and from continuing to engage in infringing acts
24  in violation of the U.S. copyright laws, pursuant to 17 U.S.C. § 502.

25      35.    On or about May 13, 2009, Plaintiff and Defendants Cogswell and
26  Cogswell Design only, entered into a negotiated stipulated permanent injunction
27  executed and entered by this Court, by and through which Defendants Cogswell and
28  Cogswell Design, and all other acting in concert with them, and no other named

10

1   Defendants in this action agreed, and were ordered by the Court to refrain from, any

2   further misappropriation of the Copyrighted Works, reserving the issue of damages

3   for adjudication by the trier of fact.  This stipulated permanent injunction was

4   negotiated directly, solely and exclusively with Defendants Cogswell and Cogswell

5   Design, and was not intended by Plaintiff herein to apply to any other Defendants in

6   this action (including, but not limited to, Defendants DFGI and EWI), and was further

7   not intended to embrace any of Plaintiff's actual or potential remedies as against any

8   Defendants other than Defendants Cogswell and Cogswell Design, and/or inclusive

9   of any theories of liability except for this claim for relief for copyright infringement.

10         36.      Plaintiff is further entitled to recover from Defendants its costs and

11   reasonable attorneys expended in bringing this action, pursuant to 17 U.S.C. § 505.

12                         SECOND CLAIM FOR RELIEF

13         (Misappropriation of Trade Secrets Against Defendants Cogswell,

14          Cogswell Design, EWI, DFGI, and DOES 26 through 50, Inclusive.

15                          UTSA [Civ.C. § 3426, et seq.])

16         37.      Plaintiff realleges and incorporates by reference each of the allegations

17   of paragraphs 1 through 11, and 13 through 27, above, as though fully set forth

18   herein.

19                          Trade Secrets Definition

20         38.      Pursuant  to  Cal.C.Civ.Proc.  §  2019.210,  Plaintiff  Premier  hereby

21   identifies the following "Trade Secrets" (as the terms are used in this pleading) which

22   are at issue in this action, based upon the information presently available to Plaintiff

23   Premier.  Plaintiff Premier anticipates that the scope of this identification may

24   broaden, and precision of this identification will narrow, with evidence anticipated to

25   be disclosed during discovery which Plaintiff Premier alleges is currently within the

26   exclusive possession, custody and control of the Defendants to this claim for relief, and

27   in particular Defendants Cogswell and Cogswell Design, who are alleged by Plaintiff

28   Premier to have taken and used such trade secrets with the complicity of the other

11

1  Defendants named in this claim for relief herein as a direct result of, and through
2  access granted to him as a result of, his full-time employment with Plaintiff Premier:

3      A.    Premier's Customer lists and databases, including purchasing habits,
4  tastes, feature preferences in displays and exhibits, pricing, profit margins, costs and
5  methods of production, pricing concessions, promotional discounts, advertising
6  allowances, rebate marketing concessions and initiatives, and strategic and
7  marketing plans (hereinafter "Customer List-Related Data");

8      B.    Those hardcopy and electronic plans, patterns, and designs, including
9  sketches, drawings, engineering drawings, schematics, blueprints, coupled with the
10  technical data, parts and materials lists and specifications, and engineering
11  calculations necessary are indispensable to creation and construction of exhibits and
12  displays (hereinafter "Premier's Patterns") prepared and created by, and/or with the
13  assistance of, Defendant David Cogswell, while Defendant David Cogswell was
14  employed full time with Plaintiff Premier, which Premier's Patterns were the legal
15  property of Plaintiff Premier pursuant to Cal.Lab.C. § 2860, regardless of whether
16  Premier's Patterns did not become the subject of construction or commerce until after
17  David Cogswell's employment with Plaintiff Premier was terminated for cause.

18      39.    At present, Plaintiff Premier hereby identifies two actual projects Plaintiff
19  Premier knows and is aware were constructed by the Defendants named in this claim
20  for relief which Plaintiff Premier contends were and are within the scope of Premier's
21  Patterns, including the Walt Disney Imagineering Blue Sky Cellar/ Theatre and the
22  Jezign Shoe Box, copies of drawings of which two (2) projects within the scope of
23  Premier's Patterns, are attached hereto as Exhibit "B".

24  <u>Misappropriation of Trade Secrets</u>

25  <u>EWI/Cogswell   Misappropriation of Walt Disney Imagineering Blue Sky</u>
26  <u>Cellar/Theatre and Others</u>

27      40.    In or about March, 2008, while David Cogswell was still a full-time
28  employee of Plaintiff, and while in receipt of salaried compensation from Plaintiff

1  therefor, Defendants Cogswell individually, and acting as a corporate promoter of

2  Cogswell Design, created a design for the Walt Disney Imagineering Blue Sky Cellar/

3  Theatre to be fabricated as a semi-permanent exhibit for installation in the Walt

4  Disney California Adventure Theme Park in Anaheim, California.  Plaintiff is

5  informed and believe and thereon alleges that, for valuable consideration received,

6  and without the knowledge or permission of Plaintiff, Cogswell secretly furnished and

7  provided said Walt Disney Blue Sky Cellar design (including, but not limited to,

8  handwritten sketches and/or drawings, artist renderings, computer aided drawings

9  and graphics, graphic designs and artwork, engineering drawings, and material

10  specifications) to Defendants EWI and DOES 26 through 40, who at such time knew

11  and was aware that said design had been created by Cogswell while a full-time

12  employee of Plaintiff, acting within the scope and course of said employment.

13  Defendants EWI and DOES 26 through 40, with the exclusive use of such design,

14  thereupon constructed and fabricated said Walt Disney Blue Sky Cellar/ Theatre and

15  sold the same to The Walt Disney Company and its affiliate Walt Disney

16  Imagineering for use in The Walt Disney California Adventure Theme Park, earning

17  a profit on the project attributable to said Walt Disney Imagineering Blue Sky Cellar/

18  Theatre design. Plaintiff alleges that, pursuant to Cal.Lab.C. §2860, the Walt Disney

19  Imagineering Blue Sky Cellar/ Theatre was at all times the intellectual property of

20  the Plaintiff. At the time of said misappropriation by Defendants Cogswell and EWI,

21  The Walt Disney Company and its affiliate Walt Disney Imagineering were clients of

22  Plaintiff, Premier.

23      41.    Plaintiff is informed and believes and thereon alleges that, at all times

24  herein mentioned, and within two years prior to the filing of the initial complaint in

25  this action, EWI knowingly and purposefully was furnished by Cogswell with, and

26  accepted from Cogswell, other designs (including, but not limited to, handwritten

27  sketches and/or drawings, artist renderings, computer aided drawings and graphics,

28  graphic designs and artwork, engineering drawings, and material specifications) for

13

1  competitive displays and exhibits similar to the Walt Disney Imagineering Blue Sky
2  Cellar/ Theatre design, which designs Cogswell misappropriated from Plaintiff and/or
3  created while a full-time employee of the Plaintiff, which designs were therefore the
4  intellectual property of the Plaintiff pursuant to Cal.Lab.C. §2860, which designs EWI
5  then fabricated, manufactured, and sold to competitors of the Plaintiff. Plaintiff is
6  presently unaware of the precise nature of such designs because, inter alia, upon his
7  termination from Plaintiff, Cogswell deliberately erased certain computer files, e-
8  mails, and hard drives from Plaintiff's computer server and electronic storage, to
9  prevent Plaintiff's discovery of the extent of such misappropriation, which knowledge
10 is in the exclusive possession, custody and control of the Defendants named in this
11 claim for relief, and each of them. Plaintiff anticipates that the precise identification
12 and definition of such other designs alleged herein shall be ascertained and disclosed
13 in discovery in this action, and proven according to proof at trial.

14      42.    All of the designs described in ¶¶ 40 and 41, hereinabove, are within the
15 scope of the trade secrets designated above as Premier's Patterns.

16      43.    Plaintiff is further informed and believes and thereon alleges that, within
17 two years prior to the initial filing of this action, Defendants Cogswell, Cogswell
18 Design, and EWI, also misappropriated Plaintiff's Customer List-Related Data, and
19 have employed such Customer List-Related Data to compete against Plaintiff as
20 against Plaintiff's own clients.

21 DFGI/Cogswell Misappropriation of Jezign Shoe Box Design and Others

22      44.    In or about March, 2008, while David Cogswell was still a full-time
23 employee of Plaintiff, and while in receipt of salaried compensation from Plaintiff
24 therefor, Defendants Cogswell individually, and acting as a corporate promoter of
25 Cogswell Design, created a design for a partially transparent shoe box display to be
26 fabricated as an exhibit for Jezign, footware manufacturer who at the time was a
27 client of Plaintiff. Plaintiff is informed and believes and thereon alleges that, for
28 valuable consideration received, and without the knowledge or permission of Plaintiff,

14

1  Cogswell secretly furnished and provided said Jezign Shoe Box design (including, but
2  not limited to, handwritten sketches and/or drawings, artist renderings, computer
3  aided drawings and graphics, graphic designs and artwork, engineering drawings,
4  and material specifications) to Defendants DFGI and DOES 41 through 50, who at
5  such time knew and was aware that said design had been created by Cogswell while
6  a full-time employee of Plaintiff, acting within the scope and course of said
7  employment. Defendants Cogswell, Cogswell Design, DFGI and DOES 41 through 50,
8  with the exclusive use of such design, thereupon constructed and fabricated said
9  Jezign Shoe Box and sold the same to Jezign, earning a profit on the project
10 attributable to said Jezign Shoe Box design.  Plaintiff alleges that, pursuant to
11 Cal.Lab.C. §2860, the Jezign Shoe Box design was at all times the intellectual
12 property of the Plaintiff.   At the time of said misappropriation by Defendants
13 Cogswell, Cogswell Design and DFGI, Jezign was a client of Plaintiff, Premier.

14      45.   Plaintiff is informed and believes and thereon alleges that, at all times
15 herein mentioned, and within two years prior to the filing of the initial complaint in
16 this action, DFGI knowingly and purposefully was furnished by Cogswell with, and
17 accepted from Cogswell, other designs (including, but not limited to, handwritten
18 sketches and/or drawings, artist renderings, computer aided drawings and graphics,
19 graphic designs and artwork, engineering drawings, and material specifications) for
20 competitive displays and exhibits similar to the Jezign Shoe Box design, which
21 designs Cogswell misappropriated from Plaintiff and/or created while a full-time
22 employee of the Plaintiff, which designs were therefore the intellectual property of the
23 Plaintiff pursuant to Cal.Lab.C. §2860, which designs DFGI then fabricated,
24 manufactured, and sold to competitors of the Plaintiff. Plaintiff is presently unaware
25 of the precise nature of such designs, because, inter alia, upon his termination from
26 Plaintiff, Cogswell deliberately erased certain computer files, e-mails, and hard drives
27 from Plaintiff's the computer server and electronic storage, to prevent Plaintiff's
28 discovery of the extent of such misappropriation, which knowledge is in the exclusive

1  possession, custody and control of the Defendants and each of them. Plaintiff
2  anticipates that the precise identification and definition of such other designs alleged
3  herein shall be ascertained and disclosed in discovery in this action, and proven
4  according to proof at trial.

5      46.    All of the designs described in ¶¶ 44 and 45, hereinabove, are within the
6  scope of the trade secrets designated above as Premier's Patterns.

7      47.    Plaintiff is further informed and believes and thereon alleges that, within
8  two years prior to the initial filing of this action, Defendants Cogswell, Cogswell
9  Design, and DFGI, also misappropriated Plaintiff's Customer List-Related Data, and
10 have employed such Customer List-Related Data to compete against Plaintiff as
11 against Plaintiff's own clients.

12     48.    The continuing use and exploitation by Defendants Cogswell, Cogswell
13 Design, EWI, DFGI, and DOES 26 through 50, inclusive, of Plaintiff's trade secrets,
14 as specifically described hereinabove in this claim for relief, without the express or
15 implied consent of Plaintiff and which were acquired secretly and with a duty to limit
16 their use solely to Defendant Cogswell's employment with Plaintiff, constitutes a
17 knowing and intentional misappropriation of Plaintiff's trade secrets, actionable
18 under California's Uniform Trade Secrets Act, UTSA - Civ.C. § 3426, et seq.

19     49.    As a direct and legal consequence of the foregoing acts of trade secret
20 misappropriation of Plaintiff's trade secrets, Plaintiff has suffered damages in an
21 amount which is presently unknown and which shall be proved at trial, which
22 includes, but is not limited to, lost profits, the profits of the Defendants Cogswell,
23 Cogswell Design, EWI, DFGI, and DOES 26 through 50, inclusive, and each of them,
24 any unjust enrichment, a reasonable royalty and any other damages and monetary
25 relief provided for by Cal.Civ.C. § 3426.3, and California law.

26     50.    Plaintiff is further informed and believes that Defendants Cogswell,
27 Cogswell Design, EWI, DFGI, and DOES 26 through 50, inclusive and each of them
28 through (a) their right and ability to supervise the misappropriation; and (b) their

1   obvious and direct financial interests in the misappropriation of the Plaintiff's trade
2   secrets, are vicarious liable for the unlawful misappropriation of each of the other
3   Defendants and each third party as alleged hereinabove.

4      51.   Plaintiff is further informed and believes that Defendants Cogswell,
5   Cogswell Design, EWI, DFGI, and DOES 26 through 50, inclusive, acting with
6   knowledge of misappropriation activity, induced, caused, or materially contributed to
7   the misappropriation and is contributorily liable for the unlawful misappropriation
8   of Plaintiff's trade secrets by each of the other said Defendants and each third parties
9   as alleged hereinabove.

10     52.   The acts of misappropriation by Defendants Cogswell, Cogswell Design,
11  EWI, DFGI, and DOES 26 through 50, inclusive, are causing irreparable injury to
12  Plaintiff. Plaintiff has no other plain, adequate or speedy remedy at law, and thus
13  temporary, preliminary, and permanent injunctive relief restraining said Defendants
14  named hereinabove in this paragraph, and each of them, as well as their officers,
15  agents, employees, and all other persons acting in concert with them, from engaging
16  in, and continuing to engage in, such misappropriation, is necessary and proper
17  pursuant to Cal. Civ.C. § 3426.2.

18     53.   The actions of Defendants Cogswell, Cogswell Design, EWI, DFGI, and
19  DOES 26 through 50, and each of them, inclusive were, on information and belief,
20  further willful, malicious, fraudulent and oppressive, were despicable and were
21  undertaken with an intent to visit financial and economic harm upon the Plaintiff,
22  and/or with a conscious disregard of Plaintiffs rights and, accordingly, an award of
23  punitive damages against the Defendants and each of them to punish said Defendants
24  named in this paragraph, and deter such conduct in the future, pursuant to Cal.Civ.C.
25  §§ 3426.3(c), and 3294(c).

26     54.   Plaintiff is further informed and believes, and thereon alleges, that the
27  aforementioned conduct of Defendants Cogswell, Cogswell Design, EWI, DFGI, and
28  DOES 26 through 50, Inclusive and each of them, including the knowing and

17

1    intentional fabrication, construction, and sale of displays and exhibits using Plaintiff's
2    designs secretly stolen and misappropriated from Plaintiff, which displays and
3    exhibits were then sold to Plaintiff's own clients and customers, each involved the
4    investment of hundreds of thousands of dollars in developmental costs requiring the
5    investment of risk capital to such an extent that such conduct was the product of the
6    entire corporate management and corporate policy of Defendants Cogswell, Cogswell
7    Design, EWI, DFGI, and DOES 26 through 50, inclusive with respect to a willful and
8    conscious disregard for the rights of Plaintiff, such that Defendants Cogswell,
9    Cogswell Design, EWI, DFGI, and DOES 26 through 50, inclusive and each of them
10   approved, ratified, condoned, authorized, and accepted the benefits from the wrongful
11   conduct of each of their individual employees and agents who individually committed
12   the acts and omissions complained of hereinabove.

13       WHEREFORE, Plaintiff prays judgment against Defendants and each of them
14   as follows:

15
16                               PRAYER

On the First Claim for Relief

17       1.      For actual and statutory damages and lost profits in an amount which is
18   presently unknown, but which shall be determined according to proof at trial,
19   pursuant to 17 U.S.C. § 504.

20       2.      For temporary, preliminary, and permanent injunctive relief injunctive
21   relief restraining the Defendants named in said claim for relief and each of them; as
22   well as their officers, agents, employees, and all other persons acting in concert with
23   them, from engaging in and from continuing to engage in infringing acts in violation
24   of the U.S. copyright laws, pursuant to 17 U.S.C. § 502.

25       3.      For costs and reasonable attorneys expended in bringing this action,
26   pursuant to 17 U.S.C. § 505.

27   On the Second Claim for Relief

28       4.      For actual damages for trade secret misappropriation including, but not

1    limited to, lost profits, the profits of Defendants Cogswell, Cogswell Design, EWI,
2    DFGI, and DOES 26 through 50, Inclusive, and each of them, any unjust enrichment,
3    a reasonable royalty and any other damages and monetary relief provided for by
4    Cal. Civ. C. § 3426.3.

5        5.    For temporary, preliminary, and permanent injunctive relief restraining
6    Defendants Cogswell, Cogswell Design, EWI, DFGI, and DOES 26 through 50,
7    Inclusive and each of them, as well as their officers, agents, employees, and all other
8    persons acting in concert with them, from engaging in, and continuing to engage in,
9    such misappropriation, is necessary and proper pursuant to Cal. Civ. C. § 3426.2.

10       6.    For punitive and exemplary damages.

11   On all Claims for Relief

12       7.    For reasonable attorneys fees;

13       8.    For costs of suit; and

14       9.    For such other and further relief as may be proper and just.

15   ///

16   DATED:    August 5, 2009                THE KNOX-RAPHAEL LAW FIRM

17

18                                      By:  /s/ Laura M. Knox-Raphael
19                                          LAURA KNOX-RAPHAEL, Attorneys
                                            for Plaintiff.
20

21                        DEMAND FOR TRIAL BY JURY

22       Plaintiff hereby demands a trial by jury.

23

24   DATED:    August 5, 2009                THE KNOX-RAPHAEL LAW FIRM

25

26                                      By:  /s/ Laura M. Knox-Raphael
27                                          LAURA KNOX-RAPHAEL, Attorneys
                                            for Plaintiff.
28

                                    19

# EXHIBIT "1"



















# EXHIBIT "2"

















Case 8:09-cv-00354-JVS-AN   Document 37-2   Filed 08/06/2009   Page 12 of 15

















# EXHIBIT "3"

# SEE NOTICE OF LODGING
# ON FILE FOR EXHIBIT "3"

# EXHIBIT "4"

## Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

Registration Number:

**VAu 979-726**

Effective date of
registration:

March 5, 2009

---

### Title
━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

**Title of Work:**  PREMIER DISPLAYS' UNPUBLISHED PHOTOS (PADGETT)

### Completion/Publication
━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

**Year of Completion:**  2004

### Author
━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

**Author:**  PADGETT & COMPANY, INC.

**Author Created:**  photograph(s)

**Work made for hire:**  Yes

**Citizen of:**  United States          **Domiciled in:**  United States

### Copyright claimant
━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

**Copyright Claimant:**  PREMIER DISPLAYS & EXHIBITS, INC.

11261 Warland Ave., Cypress, CA, 90630, United States

**Transfer Statement:**  By written agreement

### Rights and Permissions
━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

**Organization Name:**  PREMIER DISPLAYS & EXHIBITS, INC.

**Name:**  Laura M. Knox

**Email:**  lknox@knoxraphael-law.com          **Telephone:**  949-660-1609

**Address:**  9210 Irvine Center Drive

Irvine, CA 92618  United States

### Certification
━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

**Name:**  Jay Hudson

**Date:**  March 5, 2009

---

Correspondence:   Yes

IPN#:

Registration #:    VAU000979726

Service Request #:   1-167342401

PREMIER DISPLAYS & EXHIBITS, INC.
Laura M. Knox
9210 Irvine Center Drive
Irvine, CA 92618  United States

# EXHIBIT "5"

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code,* attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**Registration Number:**

**VAu 979-727**

**Effective date of registration:**

March 5, 2009

---

## Title

Title of Work: PREMIER DISPLAYS UNPUBLISHED PHOTOS (PREMIER)

## Completion/ Publication

Year of Completion: 2004

## Author

Author: PREMIER DISPLAYS & EXHIBITS, INC.

Author Created: photograph(s)

Work made for hire: Yes

Citizen of: United States            Domiciled in: United States

## Copyright claimant

Copyright Claimant: PREMIER DISPLAYS & EXHIBITS, INC.

11261 WARLAND AVE., CYPRESS, CA, 90630, United States

## Rights and Permissions

Organization Name: PREMIER DISPLAYS & EXHIBITS, INC.

Name: To Whom it May Concern

Email: lknox@knoxraphael-law.com            Telephone: 949-660-1609

Address: 11261 WARLAND AVE.

CYPRESS, CA 90630  United States

## Certification

Name: Jay Hudson

Date: March 5, 2009

---

Correspondence: Yes

IPN#:

Registration #:   VAU000979727

Service Request #:   1-167342625

Laura M. Knox
9210 Irvine Center Drive
Irvine, CA 92618  United States

# EXHIBIT "6"

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**Registration Number:**

**PAu 3-381-310**

**Effective date of registration:**

April 9, 2009

## Title

**Title of Work:** 2006 BVG Display Video

## Completion/ Publication

**Year of Completion:** 2006

## Author

**Author:** PREMIER DISPLAYS & EXHIBITS, INC.

**Author Created:** entire motion picture

**Work made for hire:** Yes

**Citizen of:** United States          **Domiciled in:** United States

## Copyright claimant

**Copyright Claimant:** PREMIER DISPLAYS & EXHIBITS, INC.

11261 WARLAND AVE., CYPRESS, CA, 90630, United States

## Rights and Permissions

**Organization Name:** PREMIER DISPLAYS & EXHIBITS, INC.

**Name:** To Whom it May Concern

**Email:** lknox@knoxraphael-law.com

**Address:** 11261 WARLAND AVE.

CYPRESS, CA 90630 United States

**Telephone:** 949-660-1609

## Certification

**Name:** JAY HUDSON

**Date:** March 12, 2009

**Correspondence:** Yes

IPN#:

Registration #:   PAU003381310

Service Request #:   1-169653861

Laura M. Knox
9210 Irvine Center Drive
Irvine, CA 92618  United States

Case 8:09-cv-00354-JVS-AN    Document 37    Filed 08/06/2009    Page 20 of 21

1                            PROOF OF SERVICE

2   Premier Displays & Exhibits, Inc. v. Cogswell, et al.
    United States District Court
3   Central District of California Case No. SACV09-354JVS (ANx)

4         I am a resident of and employed in the aforesaid county, State of California; I am over the age of
    eighteen years and not a party to the within action; my business address is 9210 Irvine Center Drive, Irvine,
5   California.

6         On August 6, 2009, I caused to be served the foregoing SECOND-AMENDED COMPLAINT
    upon the interested parties in this action:
7
    ( )   BY ELECTRONIC EMAIL: I caused such document listed above to be transmitted by electronic
8         mail to the e-mail addresses listed below:

9   (X)   BY ELECTRONIC MAIL: I electronically filed such document with the Clerk of the Court using
          CM/ECF System, which sent electronic notification of such filing to all other parties appearing on
10        the docket sheet as listed below:

11  Lisa Borodkin, Esq.
    CALLAHAN & BLAINE, APLC              Counsel for Defendant, DISPLAY
12  3 Hutton Centre Drive, Ninth Floor        FABRICATION GROUP, INC.
    Santa Ana, CA 92707
13  Telephone: (714) 241-4444
    Facsimile: (714) 241-4445
14  Email:  lBorodkin@callahan-law.com

15  John Selbak, Esq.
    CORPORATE COUNSEL PARTNERS  Counsel for Defendants, DAVID
16  35 North Arroyo Parkway, Suite 240      COGSWELL and COGSWELL DESIGN,   INC.
    Pasadena, CA 91103
17  Telephone: (626) 689-4383
    Facsimile: (626) 243-4813
18  Email:   Jselbak@corporate-counsel.net

19  Daniel C. DeCarlo, Esq.
    Robert M. Collins, Esq.
20  LEWIS, BRISBOIS, BISGAARD & SMITH, LLP   Counsel for Defendant, EWI
    221 North Figueroa Street, Suite 1200    WORLDWIDE, aka, PRESENTATION
21  Los Angeles, CA  90012                   WORKS, INC., A Michigan Corporation.
    Telephone: (213) 250-1800
22  Facsimile: (213) 250-7900
    Email:   decarlo@lbbslaw.com
23           Rcollins@lbbslaw.com

24  ( )   BY MAIL, by placing a true copy thereof, in a sealed envelope to the addressee(s) below, and
25        depositing the same into the United States mail at the address located set forth hereinabove,
          with sufficient first-class postage thereon prepaid:
26
    ( )   BY PERSONAL SERVICE, by personally delivering a sealed envelope, containing the above-
27        referenced notice to the addressee(s) listed below:

28  ( )   BY OVERNIGHT PRIORITY MAIL WITH NEXT DAY DELIVERY GUARANTEED by
          placing a true copy thereof, in a sealed envelope to the addressee(s) below, and depositing the same

                                        20

SECOND-AMENDED COMPLAINT FOR COPYRIGHT INFRINGEMENT, ETC., AND JURY TRIAL DEMAND

1    into the **OVERNITE EXPRESS** mail drop at the address located set forth hereinabove, with
2    postage prepaid.

3        I declare under penalty of perjury under the laws of the United States of America and the State of
4    California that the foregoing is true and correct.

5    Dated:         August 6, 2009                    By:   /s/ Laura M. Knox-Raphael
6                                                          LAURA KNOX-RAPHAEL
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SECOND-AMENDED COMPLAINT FOR COPYRIGHT INFRINGEMENT, ETC., AND JURY TRIAL DEMAND

Karen Kim - Activity in Case 8:09-cv-00354-JVS-AN Premier Displays & Exhibits Inc v. David
Cogswell et al Amended Document (Non-Motion)

| | |
|---|---|
| **From:** | <cacd_ecfmail@cacd.uscourts.gov> |
| **To:** | <ecfnef@cacd.uscourts.gov> |
| **Date:** | 8/6/2009 6:35 PM |
| **Subject:** | Activity in Case 8:09-cv-00354-JVS-AN Premier Displays & Exhibits Inc v. David Cogswell et al Amended Document (Non-Motion) |

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT
RESPOND to this e-mail because the mail box is unattended.
***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy
permits attorneys of record and parties in a case (including pro se litigants) to receive one free
electronic copy of all documents filed electronically, if receipt is required by law or directed by the
filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each
document during this first viewing. However, if the referenced document is a transcript, the free
copy and 30 page limit do not apply.

### UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

### Notice of Electronic Filing

The following transaction was entered by Knox, Laura on 8/6/2009 at 6:34 PM PDT and filed on
8/6/2009
**Case Name:**     Premier Displays & Exhibits Inc v. David Cogswell et al
**Case Number:**     8:09-cv-354
**Filer:**     Premier Displays & Exhibits Inc
**Document Number:** 37

**Docket Text:**
**AMENDED DOCUMENT filed by Plaintiff Premier Displays & Exhibits Inc.** *Second-
Amended Complaint* **(Attachments: # (1) Exhibit Exhibits 1 & 2 to Second-Amended
Complaint, # (2) Exhibit Exhibits 3 through 6 to Second-Amended Complaint)(Knox,
Laura)**

**8:09-cv-354 Notice has been electronically mailed to:**

Daniel C DeCarlo     decarlo@lbbslaw.com, kkim@lbbslaw.com

John J Selbak     jselbak@corporate-counsel.net, jselbak@verizon.net

Laura M Knox     lknox@knoxraphael-law.com

Lisa J Borodkin     lborodkin@callahan-law.com, lisa_borodkin@post.harvard.edu,
mkingsbury@callahan-law.com

Sue Y Park    spark@callahan-law.com

**8:09-cv-354 Notice has been delivered by First Class U. S. Mail or by fax to: :**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**C:\Client Files (Active)\Premier\PREMIER.SAC[F].pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=8/6/2009] [FileNumber=8237932-0]
[4c3f90cb920a67fde12296176387f996f2e1203ae3d38ae9ac9099163e2b240e10ced
456020adca82a73709f4526808d69086f7ee68c58c2e9a2da41c98a49bf]]
**Document description:**Exhibit Exhibits 1 & 2 to Second-Amended Complaint
**Original filename:**C:\Client Files (Active)\Premier\Exh._1_&_2_to_SAC[1].pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=8/6/2009] [FileNumber=8237932-1]
[5377788fdff02bc29bb44c2b6e6e86071a4319b8b878d19e07c0ef4b34c87e6d7bf29
883cfff63e5151dd279e47ef9d465d1edf755ee94ea83a20a11f7202723]]
**Document description:**Exhibit Exhibits 3 through 6 to Second-Amended Complaint
**Original filename:**C:\Client Files (Active)\Premier\Exh._3-6_to_SAC.pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=8/6/2009] [FileNumber=8237932-2]
[848506b74ad406673e1bf7c129a0a2b353a7f9da5049868bc042b6c0e49ffcbd68e66
c57d3b927aefc54d1301ff14714e1b1753da3f4612db39c27daea50cbea]]

**EXHIBIT D**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PREMIER DISPLAYS & EXHIBITS, INC., A California Corporation, | ) Case No.: ) SACV09-354JVS (ANx) ) |
| Plaintiff, | ) ) |
| vs. | ) ) |
| DAVID COGSWELL, An Individual; COGSWELL DESIGN, INC., A California Corporation; DISPLAY FABRICATION GROUP, INC., A California Corporation; EWI WORLDWIDE, aka PRESENTATION WORKS, INC., aka EXHIBITS WORKS, INC., A Michigan Corporation, and DOES 1 through 50, inclusive, | ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

VIDEOTAPED DEPOSITION OF DAVID COGSWELL

VOLUME I
(Pages 1 through 150)

Taken on Wednesday, August 12, 2009, at 1:12 p.m.

Page 10

1   A.   Stephen Amato.
2   Q.   And after you worked for Premier as a
3  freelance designer, did you work for Premier again?
4   A.   I did.
5   Q.   When was that?
6   A.   2004 in November, where I joined as
7  creative director and account manager to
8  Stephen Amato.
9   Q.   Did you say account manager?
10   A.   Correct.
11   Q.   What was your first day of employment
12  with Premier?
13   A.   I'm not sure, but it was roundabout
14  November 24th.
15   Q.   And when was your last day with Premier?
16   A.   April the 1st, 2008.
17   Q.   April 1, 2008, is the date that you were
18  terminated from Premier; is that correct?
19   A.   Correct.
20   Q.   And you were terminated from Premier for
21  allegedly transmitting a design or drawing of the
22  Blue Sky Cellar to Carter Lee and your wife of EWI;
23  correct?
24   A.   Yes.
25   Q.   And you were the one to prepare the

Page 11

1  design of the Blue Sky Cellar; correct?
2   A.   No.
3   MR. SELBAK:   Objection.  Objection as to the
4  term Blue Sky Cellar.  I don't think we've laid any
5  foundation as to what it is or what you're asking
6  about.
7  BY MS. KNOX-RAPHAEL:
8   Q.   Mr. Cogswell, what was the design for
9  which you were terminated from Premier on April 1,
10  2008?
11   A.   For a sketch.
12   Q.   And what was that sketch of?
13   A.   It was a sketch of a wall detail,
14  basically it was a sketch of an existing design that
15  EWI had.
16   Q.   And how do you know that the -- and for
17  the -- let me withdraw this.
18   For the sake of clarity for the record, I
19  want us to be on the same page in how we're
20  describing or referring to the sketch.
21   What did you call the sketch?  Was there
22  a particular name that you referred to it other than
23  the sketch?
24   A.   It was just a sketch.
25   Q.   Okay.  Did you refer to it as the Disney

Page 12

1  sketch since it was for the Walt Disney Company?
2   A.   No.
3   Q.   Okay.  If I refer to it as the Disney
4  sketch, would you understand what we were talking
5  about?
6   A.   Could you answer that in another way?  I'm
7  sorry, could you -- that's a bit ambiguous in regards
8  to Disney.
9   Q.   Well, if I refer to it as the Blue Sky
10  Cellar sketch, would you understand what we were
11  talking about?
12   A.   It's still ambiguous.
13   Q.   How is it ambiguous, sir?
14   A.   Because there are a number of divisions
15  of Disney.  So, therefore, I would require you to
16  give me the actual division.
17   Q.   So you want the Walt Disney Imagineering
18  Blue Sky Cellar sketch; is that how you want me to
19  refer to it?
20   A.   The sketch was for Walt Disney
21  Imagineering.
22   Q.   Okay.  The sketch that you prepared for
23  Walt Disney Imagineering, you said that the sketch
24  was of an existing design that EWI had.
25   What are you referring to?

Page 13

1   A.   The design had already been completed
2  with regards to the layout of the exhibit.  I drew
3  over the top of an existing computer render.
4   Q.   And how did you -- how did you receive
5  this existing computer rendering?
6   A.   I was given it.
7   Q.   Who were you given it by?
8   A.   I don't recall.
9   Q.   Do you know how you received it?
10   A.   I don't recall.
11   Q.   Did you receive it in a paper format?
12   A.   I think I did.
13   Q.   Who did you speak with about the existing
14  computer rendering at the time you received it?
15   MR. SELBAK:   Objection; vague as to time and
16  also with whom he spoke.
17  BY MS. KNOX-RAPHAEL:
18   Q.   Do you understand the question, sir?
19   A.   I think it's ambiguous.
20   Please rephrase.
21   Q.   Did you speak with anyone from EWI at the
22  time that you received it?
23   A.   Yes.
24   Q.   Who did you speak with?
25   A.   My wife.

4 (Pages 10 to 13)

DAVID COGSWELL, VOL. I 8/12/09



Page 14

1 Q. Okay. Did you speak with anyone else
2 from EWI about the computer rendering from EWI, other
3 than your wife?
4 A. Carter Lee.
5 Q. Did you speak with anyone else --
6 A. No.
7 Q. -- from --
8 Let me finish my question?
9 A. Sorry.
10 Q. That's okay.
11 Did you speak with anyone else, other
12 than Carter Lee and your wife, at the time that you
13 received the computer rendering?
14 A. No.
15 Q. Did you ever receive an electronic copy
16 of the computer rendering?
17 A. No.
18 Q. Do you have any understanding as to who
19 created the computer rendering that you're discussing
20 today?
21 A. I don't.
22 Q. Now at the time that you received the
23 computer rendering you said that you spoke with your
24 wife about it.
25 What did you discuss with your wife?

Page 15

1 A. I -- with regards to the -- sorry -- with
2 regards to the rendering or with regards to the
3 computer rendering?
4 Q. You testified earlier that at the time
5 you received the computer rendering --
6 A. Uh-huh. Correct, sorry, yes.
7 Q. -- that you spoke with your wife about
8 it?
9 A. Yes.
10 Q. What did you discuss with your wife?
11 A. My wife asked me if I was -- would I like
12 to try and do a drawing over the top of an existing
13 computer rendering just for the fun of it on a
14 Saturday morning.
15 Q. Did your wife tell you anything else
16 about the computer -- computer rendering that
17 Saturday morning, other than inquiring whether you
18 would like to do a drawing over the top of it?
19 A. I don't recall.
20 Q. What was the purpose -- what was your
21 understanding as to the purpose of doing the sketch
22 over the computer rendering?
23 A. To do the sketch was to just have a hand
24 drawing rather than just a computer rendering.
25 Q. The computer rendering document that you

Page 16

1 received, do you have an understanding as to what
2 type of computer program generated the rendering that
3 you received?
4 A. What type of computer program?
5 Q. Correct.
6 A. Oh, there are many. I do not --
7 Q. Okay.
8 A. -- know which program. There are too
9 many.
10 Q. Do you have an understanding as to -- as
11 to whether or not someone from EWI had prepared the
12 computer rendering that you received?
13 A. Yes, they had prepared it.
14 Q. Okay. And how did you know that someone
15 from EWI had prepared it?
16 A. Because I was given the drawing -- the
17 paper drawing that I then sketched over the top of.
18 Q. But what was it about the computer
19 rendering that you received that led you to believe
20 that someone from EWI had prepared that computer
21 rendering?
22 A. Could you repeat the question again,
23 please?
24 Sorry.
25 Q. What was it about the computer rendering

Page 17

1 that you received that led you to believe that
2 someone from EWI had prepared it?
3 A. Because it was given to me by EWI.
4 Q. Who from EWI gave it to you?
5 A. My wife.
6 Q. What was the date of the Saturday morning
7 that your wife discussed this computer rendering with
8 you?
9 A. I don't recall.
10 Q. Would it be fair to say that it was
11 sometime prior to your transmission of your own hand
12 drawings to Carter Lee?
13 A. It would be fair to say that, yes.
14 Q. And do you have an estimate as to how
15 much time elapsed between that Saturday morning that
16 you discussed the computer rendering and the time in
17 which you e-mailed your handwritten drawing to
18 Carter Lee?
19 A. I don't recall exactly.
20 Q. I understand you may not recall exactly
21 and this is a good opportunity for me to give you yet
22 another admonition.
23 During today's proceeding there's going
24 to be times when I ask you for estimates and/or
25 approximations.

Page 146

1  it; correct?
2      MS. BORODKIN:  Well, for this one time only,
3  since this is the first time we've all discussed it
4  amongst ourselves, I would waive the assertion of
5  that objection, but not in general the idea that we
6  may later in time need to build that into our
7  scheduling.
8      MS. KNOX-RAPHAEL:  That's fine.
9      MR. SELBAK:  And I will do the same.  My concern
10  is that we started this deposition at 1:00 and we've
11  gone into too many collateral matters and we still
12  have a lot of documents in fronts of us.  So that
13  continuance is not to be construed as more time than
14  the seven hours next week.
15      MS. KNOX-RAPHAEL:  I wouldn't expect it to be,
16  counsel.
17      MR. SELBAK:  Okay.  That's why I stated it on
18  the record.
19      MS. KNOX-RAPHAEL:  And I would honor the seven
20  hour rule and if necessary we can have further
21  discussions and/or address the need for law and
22  motion, but that's what I would anticipate is
23  standing by the seven hour rule.
24      MR. SELBAK:  Okay.  That's fine.
25      MS. KNOX-RAPHAEL:  Okay.  All right.

Page 147

1      I'd like to a propose the following
2  stipulation:
3      That the court reporter be relieved of
4  her duties under the Code;
5      That a — the original transcript be sent
6  to Mr. Selbak;
7      That Mr. Selbak will transmit the
8  transcript to Mr. Cogswell for his review, any
9  corrections, if necessary, and his signing under
10  penalty of perjury;
11      That Mr. Selbak's office will maintain
12  custody of the original transcript and will make it
13  available upon reasonable request;
14      That if for any reason the original
15  transcript is lost, destroyed, or goes otherwise
16  missing, that a certified copy of this transcript can
17  be used in its place for all purposes, including
18  mediation, arbitration, and/or trial;
19      And that Mr. Selbak will notify all
20  counsel in writing of any and all corrections and
21  that the transcript has been signed under penalty of
22  perjury within 30 days of receipt.
23      So stipulated?
24      MR. SELBAK:  So stipulated.
25      MR. COLLINS:  So stipulated.

Page 148

1      MS. BORODKIN:  So stipulated.
2      MS. KNOX-RAPHAEL:  Okay.  Thank you.
3      THE REPORTER:  Lisa, do you need a copy of the
4  transcript?
5      MS. BORODKIN:  Yes, please.
6      THE REPORTER:  Robert?
7      MR. COLLINS:  Also, please.
8      THE REPORTER:  And, John, do you guys need your
9  own copy?
10      MR. SELBAK:  Not at this time.  I'll call you if
11  we do.
12      THE REPORTER:  Okay.  Thank you.
13      THE VIDEOGRAPHER:  This concludes tape number 4
14  and Volume Number I of the videotaped deposition of
15  David Cogswell.  We are now going off the record.
16  Time is 5:40 p.m.
17      (Deposition adjourned at 5:40 p.m.
18      Declaration under penalty of perjury on
19      the following page hereof.)
20
21
22
23
24
25

Page 149

1
2
3
4      DECLARATION UNDER PENALTY OF PERJURY
5
6
7      I hereby declare under penalty of perjury
8  under the laws of the State of California that the
9  foregoing is my deposition taken under oath; are the
10  questions asked of me and my answers thereto; that I
11  have read the same and have made the necessary
12  corrections, additions, or changes that I deem
13  necessary.
14      In witness thereof, I hereby subscribe my
15  name this     day of            , 2009, at
16      , California.
17
18
19
20
21      DAVID COGSWELL
22
23
24
25

DAVID COGSWELL, VOL. I   8/12/09

Page 150

REPORTER'S CERTIFICATE

1
2
3        I, Loretta Epperson, Registered Professional
4   Reporter and Certified Shorthand Reporter No. 8161,
5   duly licensed in the State of California, do hereby
6   certify:
7        That the foregoing deposition was taken
8   before me at the time and place therein set forth, at
9   which time the witness was duly affirmed by me;
10       That the testimony of the witness and all
11  objections made at the time of the examination were
12  recorded stenographically by me and were thereafter
13  transcribed, said transcript being a true copy of my
14  shorthand notes thereof;
15       That the dismantling of the original
16  transcript will void the reporter's certificate;
17       That I have no interest in the outcome of the
18  case herein.
19       In witness whereof, I have subscribed my name
20  this 21st day of August, 2009.
21
22
23
24       Loretta Epperson, RPR, CSR 8161
25

DOKICH COURT REPORTERS, INC.
800-720-9679

Premier Displays & Exhibits
11261 Warland Drive, Cypress, Ca 90630

## APPLICANT'S STATEMENT

I hereby affirm that the information provided on this application (including an accompanying resume, if any) is true and complete. I also agree that any falsified information or omissions may disqualify me from further consideration for employment and may be considered justification for dismissal if discovered at a later date.

I authorize a thorough investigation of my past employment and activities, agree to cooperate in such investigation, and release from liability or responsibility all persons and entities requesting or supplying such information which may be necessary to determine via ability to perform the job for which I am being considered or any future job in the event I am hired.

I understand that my employment is terminable "at-will", and that either I or my employer may terminate my employment at any time, with or without cause, for any or no reason, and that I am not being employed for any specific term. I further understand that this employment "at-will" agreement can be modified only in writing and signed both by me and a corporate director.

I understand that, according to federal law, all individuals who are hired must, as a consideration of employment, produce certain documentation to verify their identity and their legal authorization to work in the United States. As a consequence, I understand that any offer of employment would be contingent upon my ability to produce the required documentation within the time period required by law.

I also authorize the procurement of an investigative consumer report and understand that it may contain information about my background, mode of living, character and personal reputation. This authorization, in original or copy form, shall be valid for this and future reports or updates that may be requested.

This application for employment shall be considered active for a period of time not to exceed 45 days. Any applicant wishing to be considered for employment beyond this time period should inquire as to whether or not applications are being accepted at that time.

I understand, also, that I am required to abide by all rules and regulations of the employer.

I HAVE READ AND AGREED TO THE ABOVE PRE-EMPLOYMENT STATEMENT:

_____          11. 23. 04
Applicant's Signature                              Date

EX
43    1-19-09

Page 1

| Premier Display & Exhibit | Employee Orientation Handbook |
|---|---|

## Company Philosophy

It is the intent of the Company to attempt to pay wages that compare favorably with our industry, to provide good working conditions, to work with our employees with dignity, and to respect each employee as an individual.

No company is free from day-to-day problems, but we believe that we have the personnel policies and practices to help resolve problems. All of us must work together to keep our Company a viable and healthy organization. This is the only way we can provide a satisfactory working environment.

### Our Competitive Advantage

One of the Company's greatest assets is "know-how", it is this specialized knowledge and experience which helps Premier Displays & Exhibit to successfully compete in the market place and thus provide security and growth for our Company.

To help preserve this competitive advantage, you should be careful about what you say to those not employed by the Company. Information on the Company's production methods, production rates, and new product ideas would be very helpful to any competitor and not in our best interests.

Remember that loose and idle talk can harm the Company and our future success.

### Customer Relations

Satisfied and loyal customers are the most valuable asset of Premier Displays & Exhibits. They are the only people who can assure us of continued success and continued employment opportunities for current and prospective employees. All employees, including those who work "behind the scenes" provide an impression of the Company's attitude and social environment.

A smile costs nothing, but could help influence a customer's decision to start or continue their business relationship with Premier Displays & Exhibits. A friendly atmosphere, a helpful attitude and a genuine concern for the customer's needs is every employee's mission.

By accepting employment, you accept this mission and responsibility to do your part to insure the Company's growth and prosperity.



Page 2

| Premier Displays & Exhibits | Employee Orientation Handbook |

## Employee Relations

While "employee relations" is an extremely broad subject, there are certain basic principals that apply:

- We attempt to see that our employees thoroughly understand their duties and responsibilities and we take a personal interest in our employee's well being.
- We try to take enough time and interest in our employees to get to know them as individuals as well as employees. We attempt to keep our relationship on a friendly but business-like basis.
- We believe in earning the respect of our employees through our leadership and knowledge of our profession.
- We will attempt to develop depth in our organization by training personnel so that it is possible to promote qualified employees within the company when appropriate positions become available.
- We will attempt to meet all issues promptly and to make decisions having first secured the facts of each situation by conducting a thorough investigation.
- We recognize that management's own pace and attitude will largely determine the pace and attitude of the entire organization. We cannot expect promptness, efficiency, and honest work from our employees unless management sets the example through their own actions.
- We will attempt to deal with our employees with dignity and respect and to consider each employee as an individual.

We enjoy the ability to deal directly and honestly with our employees and recognize that all of us must work together to maintain a healthy organization.

## Community Relations

Maintaining good community relations is important to the continued success of Premier Displays & Exhibits. It is important that all employees, management and non-management alike reflect a positive image in the community off the job as well as on the job. It is the responsibility of all employees to conduct themselves in such a manner away from the job so as to be a positive reflection on the Company.

3

Page 3

Premier Displays & Exhibits                                          Employee Orientation Handbook

# Employment

## About this Handbook

As with any job change, you will experience a period of adjustment. You may have questions about your job duties, your benefits and the general operation of our company. We have prepared this handbook to assist you in finding the answers to many questions that you may have and to familiarize you with the Company's philosophy, guidelines and employee benefits. Please read it carefully and keep it for future reference. Remember, this handbook is only intended to provide a summary of the policies and benefits of our company. It is not intended to create a contract of employment or to modify the rights of the Company and you to terminate employment at any time for any reason.

This handbook replaces all prior handbooks and policies. Every effort has been made to make this handbook as comprehensive as possible. However, it cannot answer every question or anticipate every situation. Owing to ongoing changes in applicable governmental regulations and the needs of our organization to retain necessary operational flexibility in the administration of policies and procedures, the Company reserves the right to modify, rescind, delete or add to any of the provisions of this Handbook, except for the policy of at-will employment. You will be notified of modifications to the handbook.

## At-Will Employment Status

Employment at Premier Displays & Exhibits is employment at-will. Employment may be terminated with or without cause and with or without notice at any time by the employee or the Company. Nothing in this handbook or in any document or statement shall limit the right to terminate employment at-will. No manager, supervisor or employee of the Company has any authority to enter into an agreement for employment for any specified period of time nor to make an agreement for employment other than at-will.

## Equal Employment Opportunity

Premier Displays & Exhibits is an equal opportunity employer and makes employment decisions on the basis of performance and merit. We want to have the best available persons in every job. Company policy prohibits unlawful discrimination based on race, color, creed, sex, marital status, age, national origin or ancestry, physical or mental disability, medical condition, sexual orientation or any other consideration made unlawful by federal, state or local laws. All such discrimination is unlawful.

The Company is committed to comply all applicable laws providing equal employment opportunities. This commitment applies to all persons involved in the operations of the company and prohibits unlawful discrimination by any employee of the company, including supervisors and co-workers.

4

Page 4

## Policy Against Harassment

In keeping with the spirit and the intent of federal and state law, Premier Displays & Exhibits strives to provide a comfortable work environment. We are committed to a workplace that is free of discrimination and harassment based on race, color, religion, age, sex, national origin, disability, citizenship or any other protected status. Same sex harassment is also unlawful. Offensive or harassing behavior will not be tolerated against any employee. This policy applies to vendors, customers or others who enter our workplace. In addition, those in a supervisory or managerial position will be responsible for taking proper action to end such behavior in their work areas. In an effort to prevent sexual harassment and other forms of harassment from occurring, this policy against harassment will be communicated to each employee. No employee of this company is exempt from this policy.

### Prohibited Behavior

Offensive conduct or harassment that is of a sexual nature or based on race, color, religion, age, sex, national origin, disability, citizenship or any other protected status is prohibited. This includes but is not limited to:

- Physical actions, written or spoken language and graphic communications.
- Unwelcome and unwanted physical contact.
- Expectations, requests, demands or pressure for sexual favors.
- Slurs, jokes, posters, cartoons and gestures.

The above mentioned conducts are prohibited forms of harassment when any of the following is/are true:

- There is a promise or implied promise of preferential treatment or negative consequence regarding employment decisions or status.
- Such conduct is intended to or has the effect of creating an intimidating, hostile or offensive work environment or unreasonably interferes with a person's work performance.
- A third party (another employee, customer, vendor or visitor) is offended by the sexual conduct or communications, including the display of offensive materials, drawings, photographs or written materials/statements, offensive comments/language of others.

### Disciplinary Action

Harassment is considered a form of employee misconduct. Violation of this policy will subject an employee to disciplinary action up to and including termination. Any employee, who has knowledge of such behavior, yet takes no action to report it, or in the case of supervisors and managers, to end it, is also subject to disciplinary action. You may also be liable in a civil action. All accusations will be quickly investigated and fairly resolved.

### Retaliation

Retaliation is prohibited. Complaints made in good faith will in no way be held against an employee. Under no circumstances will an employee be penalized for reporting improper conduct. It is our goal to stop unlawful behavior and prevent it from reoccurring.

Page 8

# Employee Classification

### Introductory Period

The first 90 days of continuous employment at the Company is considered an "introductory period." During this time you will learn your responsibilities, get acquainted with fellow employees and determine whether you are happy with your job. Also, during this time, your supervisor will closely monitor your performance.

During the introductory period, your supervisor will explain your job responsibilities and the performance standards expected of you. Be aware that your job responsibilities may change at any time during your employment. From time to time, you may be asked to work on special projects or to assist with other work necessary or important to the operation of your department or the Company. Your cooperation and assistance in performing such additional work is expected.

The Company reserves the right, at any time, with or without notice, to alter or change job responsibilities, reassign or transfer job positions or assign additional job responsibilities.

Completion of the introductory period does not entitle you to remain employed by the Company for any definite period of time. Both you and the Company are free, at any time, with or without notice and with or without cause, to end the employment relationship and your compensation. After completion of the introductory period, eligible employees must complete insurance enrollment forms within 30 days, (includes mailing and processing time) to qualify for employee benefits described in this handbook. (Refer to Benefits section.)

You are encouraged to ask questions of your supervisor or other appropriate individuals whenever necessary to help you become better informed about your job, the Company, and what improvements may be expected of you.

### Full-Time Employee

Regular full-time employees are those who are normally scheduled to work and who do work a schedule of forty (40) hours per week.

### Part-Time Employee

Part-time employees are those who are normally scheduled to work and who do work less than thirty-two (32) hours per week. Part-time employees may be assigned to a work schedule in advance or may work on an as-needed basis. Part-time employees are not eligible for fringe employee benefits described in this handbook except where mandated by law.

### Length of Service

Your first day of employment will become your service date. This date will be assigned as your service date after you have completed your introductory period. This will continue to be your service date unless you are separated from the Company.

Page 8

Premier Displays & Exhibits

Employee Orientation Handbook

## Employee Status

Depending upon an employee's pay level, combined with the employee's job duties and responsibilities, each employee is classified as either "Exempt" or "Non-Exempt" for payroll purposes. These two terms refer to whether or not an employee is exempted from the overtime provisions of applicable wage and hour laws.

### Exempt Status

Employees whose positions and salary levels meet the necessary legal requirements are classified as "Exempt." Exempt employees are not covered by state and federal overtime provisions and, therefore, are not paid overtime pay.

### Non-Exempt Status

Employees whose positions and pay levels do not meet certain legal requirements necessary for exemption from the applicable overtime laws are classified "Non-Exempt." Non-exempt employees are required by state and federal laws to be paid premium overtime rates for approved overtime work. The overtime rates are specified by law.

### Outside Employment

The Company would prefer that full-time employees not accept employment outside of the Company. However, your personal activities outside of working hours are a private matter and the Company's primary concern is to avoid a conflict of interest and the possible negative effect of such outside activities on your job performance.

You may engage in work outside your regular work at the Company, provided this work does not detract from your job performance, is not harmful to the Company's best interests, and does not present a current or potential future conflict of interest with your employment here. It is, however, our policy that any "outside" employment of business activity be considered secondary to your employment with Premier Displays & Exhibits. Employees who may work for Company competitors or subcontractors must notify management in advance in order to prevent possible conflicts of interest.

The Company's Workers' Compensation Insurance will not pay for illness or injury arising from any outside employment or outside business activity.

Premier Displays & Exhibits                                    Employee Orientation Handbook

## Performance Evaluation

Performance evaluations will review factors such as the quality and quantity of the work you perform, your knowledge of the job, your initiative, your work attitude, attendance and promptness, and your attitude toward others. The performance evaluations should help you become aware of your progress, areas for improvement, and objectives or goals for future work performance.

Positive performance evaluations do not guarantee increases in salary or promotions. Salary increases and promotions are solely within the discretion of the Company and depend upon many factors in addition to performance.

The frequency of performance evaluations may vary depending upon length of service, job positions, past performance, changes in job duties, or recurring performance problems.

After a written performance review, you will be required to sign the evaluation report simply to acknowledge that it has been presented to you and discussed with you by management and that you are aware of its contents.

## Standards of Conduct

Premier Displays & Exhibits expects all employees to observe certain standards of behavior while at work. These standards are not intended to restrict your legitimate rights, but to apply the same standards to everyone.

While it is not normally Company policy to discharge an employee for the first violation of rules and policies, violations of certain rules and policies are more serious than others. In those instances, the Company has no alternative other than immediate suspension without pay of the employee or employees involved, pending investigation of the circumstances involved. All instances where disciplinary action is required will be thoroughly examined. Corrective action will be as consistent as possible. It must be remembered that the employment relationship is based upon the mutual consent of the employee and Premier Displays & Exhibits. Accordingly, either the employee or the Company can terminate the employment relationship at any time, for any reason, with or without cause, at either party's option, upon notice of one party to the other.

The following actions on the part of the employees, while not all inclusive, will result in disciplinary action, including suspension which may be followed by discharge without prior warning.

1. Theft or unauthorized use of Company property or the property of other employees. This shall be deemed to include unauthorized use of tools, machines, computers, internet access, electronic communication, instant messaging and telephone, calls not related to Company business, misappropriation of office or shop supplies, equipment or postage, unauthorized use of Company credit cards or other accounts.

2. Dishonesty of any kind.

3. Damage, destruction or unauthorized use of Company property, other employee's property or visitor's property.

Page 8

## Standards of Conduct

4. Fighting or inciting a fight, intimidation of or interference with the rights of other employees or members of management or creating a disturbance on Company premises.

5. Causing, creating or participating in a disruption of any kind during working hours on Company property.

6. Engaging in any criminal activity on or off the Company's premises which makes it undesirable to continue the employment relationship.

7. Falsifying employment records (including time cards), work records or other company records.

8. Chronic or excessive absenteeism or tardiness.

9. Horseplay, carelessness and/or working in a manner which may present a hazard to safety.

10. Failure to use safety devices and/or failure to observe known or established safety rules and/ or failure to report an on-the-job injury immediately to your supervisor.

11. Negligence or unsatisfactory job performance.

12. Possession of weapons.

13. Working under the influence of alcohol or illegal drugs; bringing them into Company facilities or on Company business.

14. Insubordination, including but not limited to failure or refusal to obey the orders or instructions of a supervisor or member of management or the use of abusive, rude or threatening language toward a supervisor or member of management.

15. Failure to notify a supervisor when unable to report to work.

16. Unreported absence of three (3) consecutive scheduled workdays.

17. Failure to obtain permission to leave work for any reason during normal working hours.

18. Failure to observe working schedules, including rest and lunch periods.

19. Failure to provide a physician's certificate when requested or required to do so.

20. Working overtime without authorization or refusing to work assigned overtime.

21. Committing a fraudulent act or breach of trust under any circumstances.

22. Failure to adhere to the Company's stated policy of Equal Employment Opportunity, including the Policy Against Harassment.

23. Other major violations of the rules and regulations of the Company or repeated violations of minor company rules and regulations.

The foregoing list is not intended to be all-inclusive, but to serve as a guideline of the types of behaviors that are not acceptable at Premier Displays & Exhibits. No list, regardless of how extensive it may be, can take the place of common sense in the observance of all other proper standards of conduct.

9

Page 9

Premier Displays & Exhibits

## Counseling and Discipline

To ensure the well being of all employees, violations of company policy or standards will result in corrective action appropriate to the offense. The severity of the corrective action in response to the violation will be determined by such considerations as the impact of the offense on company operations, the extent of damage caused, and the circumstances of the offense.

Routine disciplinary procedures normally begin with a verbal counseling session, then move on to a formal documentation, in writing, to possible suspension, and ultimately, termination of employment.

In serious cases of misconduct, rule violation or unacceptable job performance, the company reserves the right to utilize any of these steps on a first-time basis.

## Impartial Dispute Resolution

Even in the best-run companies, disputes may arise. Premier Displays & Exhibits is committed to speedy, impartial dispute resolution while avoiding the costly and time consuming court system. The Mutual Agreement to Arbitrate Claims (included in the Policy/Orientation Acknowledgement Forms package) will be used for any dispute resolution that cannot be accomplished directly between the Company and the employee.

## Termination

### Dismissal

As noted elsewhere in this handbook, employees of Premier Displays & Exhibits are not hired for any specified term. Accordingly, all employees remain free to resign at any time, with or without cause, and the Company similarly may elect to end its relationship with any employee at any time, with or without cause.

### Voluntary Termination

Notices of resignation should be submitted to the Operations Manager and to the employee's supervisor. The reason for resignation should be stated in the notice. A voluntary termination is defined as a resignation or if an employee fails to report to work for three (3) consecutive scheduled work days without notice to, or approval of, his/her supervisor.

### Reduction in Force

Under some circumstances, the Company may need to restructure or reduce its workforce. If it becomes necessary to restructure our operations or to reduce the number of employees, the Company will attempt to provide advance notice of such changes if it determines that providing such notice is appropriate and possible. The precise factors that will be used to select employees for reductions in force or restructuring will depend upon the facts and circumstances of each case. However, such factors may include, but are not limited to, operational requirements, the skill, productivity, ability, past performance and cross-training of those involved, potential future performance, and, when appropriate, length of service.

## Termination

### Notice of Resignation

Employees who voluntarily resign are expected and requested to give advance written notice of resignation. Generally, at least two (2) weeks notice is expected.

### Final Pay

All terminating employees will be paid in full in accordance with State Labor Law requirements. All compensation due employee involved in an involuntary termination will, by state law, be paid immediately on the last day of employment. All final compensation due an employee voluntarily terminating will be paid to the employee on the last day of employment or if no advance notice is given, within 72 hours from the date the notice is received.

### Surrender of Company Issued Property and Access To Company Property

It is the responsibility of any terminating employee to return all company property issued to him or her at any time during the term of employment that has not previously been returned to the company. This would include, but not necessarily be limited to, the Employee Orientation Handbook, the Illness & Injury Prevention Program Handbook, tools, equipment, supplies, keys, etc. All such property must be returned to your supervisor on or before the date of termination.

If the termination is immediate or at management's discretion, access to all or any Company property, including information technology and communications systems, may be restricted or terminated immediately.

Premier Displays & Exhibits                                                      Employee Orientation Handbook

## Attendance and Wages

### Wages and Salary Administration

It is our policy to establish wages rates that are competitive with the rates paid by other companies doing similar work in the community.

Generally, your rate is based on the job you are doing, the skills required in that job, and your length of time with us. This policy, like others, is always subject to change.

### Working Hours and Schedules

Premier Displays & Exhibits is normally open five (5) days a week, Monday through Friday, office hours are 8:00 a.m. to 5:00 p.m. Hours may vary according to department, shift, and specific job; however, standard work hours for shop personnel is 7:00 a.m. to 3:30 p.m.

### Meal and Rest Periods

Non-exempt employees are provided with one (1) 30-minute meal period to be taken approximately in the middle of the work day. Breaks for non-exempt employees will be in accordance with prevailing laws. You are expected to observe your assigned working hours and the time allowed for meal and rest period. When working overtime, shop employees may be allowed a paid 10-minute break at 8:00 p.m.

You are not permitted to work during the lunch period for either the purpose of "making up" excused time or for overtime purposes. All employees must return from rest and meal periods on a timely basis. Late returns are not acceptable and are subject to disciplinary action.

### Attendance and Punctuality

Excessive absence or tardiness can be extremely disruptive to our operation and puts an unfair burden on the employees who are in regular attendance.

Each person and each job function play an important part in our ability to succeed as a company. It is important that you are here each day you are scheduled to work. However, there may be times when you must be absent for personal reasons or illness. If you know you must be absent, be sure to discuss it in advance with your supervisor.

Punctuality and regular attendance plays a very important part in your performance. Tardiness or absenteeism may be cause for disciplinary action.

If you know in advance that an important personal reason will keep you from being on time, or from attending work, notify your supervisor. Shop employees are to notify their Lead Man/Supervisor. All other employees should notify the Operations Manager or their Department Manager. If you are late and did not give advance notice, see your supervisor as soon as you report for work.

If you are absent for three (3) consecutive days without notification to the Company of the reasons for or the anticipated length of absence, you will be considered to have voluntarily resigned with or without further notification from the Company.



Page 12

*Premier Displays & Exhibits*                                                    Employee Orientation Handbook

## Pay Rate for Non-Exempt (Shop) Employees

**On weekdays**, after 8 continuous hours, time-and-one-half will be paid for the first four hours of overtime and double-time will be paid for any additional, continuous hours worked in a single shift (24 hour period).

**On Saturdays**, time-and-one-half will be paid for the first 12 continuous hours, and double-time will be paid for any additional, continuous hours worked in a single shift (24 hour period).

**On Sundays**, double-time will be paid for all hours worked.

**On Holidays**, double-time-and-one-half will be paid for all hours worked.

**The policy regarding eligibility for over-time and holiday pay is as follows:**

* If you do not work a minimum of 40 hours per week (Monday through Friday) and the following Monday (unless one or the other is a Company observed holiday), you will be paid straight-time for any hours you work on Saturday.

* If you do not work on Saturday and the following Monday, you will be paid time-and-one-half for any hours you work on Sunday.

* If you do not work the day before a holiday (if it is a scheduled work-day) and the next scheduled work-day after the holiday, you will be paid double-time for any hours you work on the holiday.

* If you do not work on the workday before a Company observed holiday (including Saturday or Sunday when requested) and the first workday following the holiday, and you do not turn in an approved absentee form prior to the date you did not work, you will not be eligible for holiday pay without a verifiable doctor's report.

* All time-and-one-half hours must be worked before any double-time will be paid.

* The eligibility requirements listed above do not apply to employees who have submitted proper absentee forms and the requests for time off have been approved prior to the date(s) of absence and they do not work on the Saturday or Sunday or the Company observed (paid) holiday. In this case, the employee would be paid the normal 8 hours straight time for a Company observed holiday plus any accrued vacation or sick time pay for any additional requested time off.

All overtime work must be approved in advance per the Premier Employee Orientation Handbook, page 13.

13

Page 14

Premier Displays & Exhibits                                    Employee Orientation Handbook

## Unemployment Insurance

Premier Displays & Exhibits pays thousands of dollars each year to a State Unemployment Insurance Reserve account. You do not make any contributions to this fund. The State Unemployment Insurance provides a weekly benefit for a specified period of time should you be terminated through no fault of your own. These benefits change periodically and are established by state law.

## Workers' Compensation Insurance

All employees are covered by Workers' Compensation Insurance, effective the first day of employment. Workers' Compensation Insurance provides you or your beneficiaries with certain benefits in the event of job-related illness, injury or accidental death.

The company pays the full cost of this insurance.

If you sustain an on-the-job or job-related illness or injury, you must report the illness or injury to your supervisor as soon as possible. Failure to do so could result in a delay or denial of benefits by the insurance carrier. Further, the Company reserves the right to exercise disciplinary action in conformance with the Injury & Illness Prevention Program (IIPP).

You will be paid for the time lost on the day of the injury if you return to work after visiting the doctor. If you miss work for a longer period of time because of the injury and have completed the necessary forms, you will be covered by our Workers' Compensation Insurance carrier.

If you sustain an occupational illness or injury, you will be paid for the actual time worked the day the injury occurs or the illness commences.

### Fraudulent Claims

Employees and former employees are frequently encouraged by outside persons to file fraudulent workers' compensation claims. Thus, for your protection, you should know that the State's Insurance Fraud Prevention Act contains the following statement:

"Any person, who knowingly presents a false or fraudulent claim for the payment of a loss, is guilty of a crime and may be subject to fines and confinement in state prison."

A person convicted of filing a fraudulent workers' compensation claim may be sentenced to State prison for two (2) to five (5) years, or fined up to $50,000, or both. Under some circumstances, the fine can exceed $50,000.

## State Disability Insurance (SDI)

All California employees are covered by State Disability Insurance effective the first day of employment. State Disability Insurance provides you with certain benefits in the event of illness or injury which is not job-related.

By state law, employees are required to pay the cost of this protection through payroll taxes on their earnings. The company, also by state law, is required to withhold this tax from your paycheck.

## Garnishment of Pay

A garnishment is a legal levy by a creditor against an individual's wages. Premier Displays & Exhibits expects all employees to manage their personal finances so as not to involve the company, however, we will honor and fulfill all garnishments and other wage attachment orders that are required by law.

15

Page 15

Premier Displays & Exhibits                                          Employee Orientation Handbook

## Benefits

### Communication of Benefit Programs

All employees will gain information regarding benefits through an initial orientation, the employee handbook, benefit booklets, and access to more detailed benefit documents when requested.

Premier Displays & Exhibits reserves the right to change or eliminate any benefit at their sole discretion with or without notice. Changes in employee benefit programs, if any, will be communicated in one or more of the following ways:

- An official written announcement.
- Posting of notices at appropriate locations.
- Publication of updated benefit booklets.
- Publication of a revised Employee Orientation Handbook or pages.
- Discussion of major changes at employee meetings.
- Description and discussion of all benefit changes at management meetings.

This section of the handbook is intended to provide a general overview of the benefits available to eligible employees at Premier Displays & Exhibits. Some benefits are governed by state and/or federal law, while others are governed by legally binding contracts between the company and a benefit provider. If there is any difference between a benefit as outlined in this section and the provisions of an applicable law or contract, the law and/or contract will prevail.

### Group Health Insurance Program

After 90 days of employment, (1) employees are eligible to enroll in the Company's group health, dental, and vision insurance program. The Company pays the cost of premiums for the (2) employee. Employees may also enroll eligible dependents. Employees are responsible for the cost of premiums for dependents.

(1) Coverage begins on the 1st of the month following acceptance of eligible enrollment by the insurance company.
(2) The Company pays for HMO group insurance for the employee only. All additional costs for other coverage/policies/dependents will be deducted (in pre-tax income) from the employee's payroll checks.

### Paid Holidays

Employees become eligible for Company paid holidays after 90 days of employment. The Company provides eight (8) paid holidays per calendar year. A schedule of paid holidays is posted every calendar year. Employees are also provided a paid day off on their anniversary date of hire. If the date falls on a weekend or work schedules make it inconvenient, you may take the day off up to a maximum of 15 days after the actual date.

16

Page 16

Primer Displays & Exhibits                                              Employee Orientation Handbook

Reasonable advance notice for time off/vacation must be given by the employee to their supervisor in order that another employee may be assigned, if required, to the work being performed by the employee requesting the time off.

Reasonable advance notice is a minimum of two (2) calendar weeks.

## Religious Holidays

In order to reasonably accommodate the religious needs of employees, time off for observation of religious holidays which are not scheduled as Company paid holidays may be taken without pay. At the employee's option, vacation hours or personal day, if available, may be used for religious holiday observation.

## Vacation

Regular full-time employees working 40 hours or more per week will accrue paid vacation time ("for all straight time hours worked) in accordance with the following schedule:

* Five (5) days* upon completion of the first year, accrued at the rate of .019231 per hour during the first year of employment;

* Ten (10) days* upon completion of the second year, accrued at the rate of .038462 per hour, during the second year through the fourth year of employment;

* Fifteen (15) days* upon completion of the fifth year, accrued at the rate of .057692 per hour, during the fifth year of employment and thereafter.

*Employees whose work week schedule is less than 40 hours per week will accrue paid vacation time proportional to hours worked.

* Vacation time will not be paid until it is fully accrued each year; full accrual occurs on your anniversary date.

* The Company encourages employees to take vacation on an annual basis.  Vacation time should be taken within the year following accrual.

* The maximum accrual of unused vacation time is 15 days.

* The Company reserves the right to schedule employees to take unused vacation time.

* Vacation shall be scheduled to provide adequate coverage of job responsibilities and staffing requirements.

* Management will make final determinations and must approve your vacation schedule in advance.

* Vacation time does not accrue during a leave of absence or "no pay" unpaid days off.  Temporary and part-time employees do not accrue paid vacation time.

* Terminating employees will be paid any accrued vacation in a lump sum at termination.

* When a recognized Company paid holiday occurs during your vacation period, the day will be considered a paid holiday, and your accrued vacation time will not be charged for that day.

17

Page 17

## Personal/Sick Days

The Company offers five (5) personal/sick days per year, starting with your date of hire and your anniversary date thereafter. Employees become eligible for (1) sick day after 90 days of continuous employment and will accrue additional days at the rate of .44 (days) for every month of continuous employment the first year. All years thereafter, the accrual rate is .41 (days) for every month of continuous employment. Unused personal/sick days may be carried over and accumulated to a maximum of fifteen (15) days.

## Verification of Absence

If you are absent longer than three (3) days due to illness, medical evidence of your illness and/or medical certification of your fitness to return to work may be required.

## Bereavement Leave

Premier Displays & Exhibits provides full-time, regular employees paid bereavement leave of up to three (3) working days whenever there is a death in the employee's immediate family. Immediate family is defined as a spouse, child, parent, sister or brother, and grandparent(s).

Employees must notify his/her Supervisor as soon as possible in the event of death of an immediate family member and record time off on the time card.

## Family Leave of Absence

Eligible employees are entitled to take pregnancy disability, family, and medical leaves of absence on the terms set forth below. The purpose of our policy is to allow eligible employees to take time off to (a) recuperate from temporary disabilities (including pregnancy related disabilities), (b) care for newborn or newly adopted children, or (c) care for a seriously ill child, spouse, or parent. The following is a summary of our pregnancy disability, family, and medical leave of absence policies:

### Pregnancy Disability Leave of Absence.

**Eligible Employees:** All employees who are disabled due to pregnancy, childbirth, or related medical conditions are eligible to take a Pregnancy Disability Leave at any time after their date of hire. Should you wish to request a Pregnancy Disability Leave of Absence, please follow the procedures outlined in *"Procedures for Requesting Leave"* described in this section.

**Length of Leave:** Employees temporarily disabled due to pregnancy, childbirth, or related medical conditions are entitled to take up to four months off due to such disabilities. Although we would prefer that you try to take time off in a single increment in order to minimize any disruption associated with your absence, Pregnancy Disability Leave may be taken intermittently or on a reduced schedule basis when deemed to be medically advisable by your health care provider. All pregnancy disability absences associated with a particular pregnancy (time off for prenatal care, severe morning sickness, doctor ordered bed rest, childbirth, recovery from childbirth, etc.) will be considered part of the same Pregnancy Disability Leave.

**Non-paid Leave.** Pregnancy Disability Leaves are granted on a non-paid basis. However, should you so desire, you may utilize your accrued vacation time and sick pay to continue your pay during your leave.

Page 18

Premier Displays & Exhibits

Employee Orientation Handbook

## Pregnancy Disability Leave of Absence

It is likely that your pregnancy disability will also constitute a "serious health condition" that will qualify you for a Medical Leave under the Federal Family and Medical Leave Act (The "FMLA"). In such circumstances, your Pregnancy Disability Leave and your Medical Leave under the FMLA will run concurrently. The Company will maintain group health benefits during the first 12 workweeks of any leave of absence you take during the relevant 12-month period for disabilities due to pregnancy, childbirth or related medical conditions, other disabilities, or family care, on the same terms and conditions of coverage that would prevail had you not gone on leave. You must continue to make any normal premium contribution during your leave. Payments must be made by the first of each month and should be sent to Premier Displays & Exhibits. Failure to pay your share of premiums may result in the cancellation of your coverage.

If you have not worked for the company for more than 12 months or have not worked more than 1,250 hours in the past year (and are therefore ineligible for Medical Leave), or if you are eligible for Medical Leave but for some reason your pregnancy disability does not constitute a serious health condition under the FMLA, or if you have previously used all FMLA Medical Leave available to you for the relevant 12-month period, then the Company will not pay for your group health insurance coverage while you are out on Pregnancy Disability Leave. Should you wish to maintain your coverage in such circumstances, you must pay the premiums for such coverage. Please note that allowing your coverage to lapse may have severe consequences for you and your dependents, including loss of coverage for the costs of your child-birth, and loss of coverage for pre-existing conditions.

Employees out on Pregnancy Disability Leave do not accrue paid vacation, sick leave, or holiday pay.

Coordinating Pregnancy Disability Leave and Medical Leave: As mentioned above, should you become disabled due to pregnancy, childbirth, or related medical conditions, you may also have a "serious health condition" that will qualify you for a Medical Leave. At the end of such period, your FMLA Medical Leave rights, including the Company's obligation to continue paying its share of your health insurance premiums, will end. However, you may still have some of your four months of Pregnancy Disability Leave remaining. In addition, assuming you are otherwise eligible for Medical Leave, you may still be entitled to up to 12 more workweeks off for Medical or Family Leave under California's family and medical leave rules.

For example, if you became disabled in your fifth month of pregnancy, you could use your four months of Pregnancy Disability Leave. Assuming you were eligible for Medical Leave and had not previously used any Medical or Family Leave, your available Federal Medical Leave would run concurrently for up to the first 12 workweeks of your Pregnancy Disability Leave, and during this period your health insurance would be maintained on the same terms as before your leave.

19

Page 15

## Pregnancy Disability Leave of Absence

### Coordinating Pregnancy Disability Leave and Medical Leave (Cont.)

After 12 weeks, your federal FMLA Medical and Family Leave rights would have been used up, and the Company's obligation to continue paying its portion of your health insurance premiums would end, but you would have one month of Pregnancy Disability Leave available to use if you were still disabled due to your pregnancy. Following childbirth, you would not have any Pregnancy Disability Leave or federal FMLA Family or Medical Leave remaining, but you would still be entitled to up to 12 workweeks of Family and Medical Leave under California law (although the Company would not have any further obligation to continue paying for your health insurance if you were to take such leave). Please contact management if you have any questions regarding the foregoing.

## Medical Leaves of Absence

**Eligible Employees.** Generally, employees are eligible to take a Medical Leave if (a) they have been employed by the Company for one year or more, (b) they have worked more than 1,250 hours during the immediately preceding 12 months, and (c) the Company employs 50 or more employees within seventy-five miles of the employee's worksite.

**Length of Leave.** If you are eligible for a Medical Leave, you will be entitled to take up to 12 workweeks off in any rolling 12-month period (the 12-month period measured backward from the date you seek to commence your Medical Leave) to recuperate from a temporary disability that prevents you from performing one or more of the essential functions of your position. All of the Medical and Family Leave you have previously taken during the 12-month period will be added together for purposes of calculating your remaining available leave. For example, if you had previously taken 3 weeks of Family Leave in the 12-month period, then you would have 9 weeks of remaining Medical and Family Leave available. If you suffer a work-related injury and go out on an occupational disability Workers' Compensation leave of absence, then your time away from work will constitute and run concurrent with the Medical Leave available to you under this Medical Leave policy, assuming that your injury constitutes a serious health condition which would otherwise entitle you to Medical Leave.

In order to avoid too much disruption, we would prefer that you try to take time off for Medical Leave in a single increment. However, if necessary to allow for medical treatment or to otherwise accommodate your temporary disability, you may take your Medical Leave on an intermittent basis or on a reduced-work schedule when medically necessary, as determined by your health care provider. If your Medical Leave will foreseeably require intermittent leaves or a reduced-work schedule, then the Company may require you to transfer temporarily to an alternative position that will provide you with equivalent pay and benefits and better accommodate your recurring periods of leave or reduced-work schedule.

20

Page 20

## Medical Leave of Absence

**Non-Paid Leave:** If you are eligible for coverage under our group health insurance plan, then the company will maintain your group health benefits during the first 12 workweeks of any leaves of absence you take during the relevant 12-month period for disabilities due to pregnancy, childbirth or related medical conditions, other disabilities, or family care, on the same terms and conditions of coverage that would prevail had you not gone on leave.  You must continue to make your normal premium contribution during your leave.  Payments must be made by the first of each month and should be sent to Premier Displays & Exhibits.  Failure to pay your share of premiums may result in the cancellation of your coverage.  Please note that if you fail to return to work after your Medical Leave for reasons other than your continued disability or other extenuating circumstances, we will be entitled to recover from you any health insurance premiums that we paid on your behalf.

Employees out on Medical Leaves of absence will not accrue vacation pay, holiday pay, or personal days pay during their leave.

## Family Leave

Eligible employees who wish to take time off because they have a newborn or newly adopted child, or because they must care for their seriously ill child, spouse, or parent (a "family member"), may do so on the following terms:

**Employees Eligible for Family Leave:**  Generally, employees are eligible to take a Family Leave if (a) they have been employed by the company for one year or more, (b) they have worked more than 1,250 hours during the immediately preceding 12 months, and (c) the company employs 50 or more employees within seventy-five miles of the employee's worksite.

**Qualifying Events:**  If you are an eligible employee, you may take a Family Leave for any of the following reasons (a "qualifying event"):  (a) the birth of your child; (b) the placement of an adopted or foster care child with you; or (c) the need to care for your child, parent or spouse who has a serious health condition.  For purposes of this policy, a "serious health condition" means an illness, injury, impairment, or physical or mental condition that involves either (a) in-patient care in a hospital, hospice, or residential health care facility, or (b) continuing treatment by a health care provider.

**Length of Leave:**  If you are eligible for a Family Leave, you will generally be entitled to take up to 12 workweeks off in any rolling 12-month period (the 12-month period measured backward from the date you seek to commence your leave).  All of the Medical and Family Leave you have previously taken during the 12-month period will be added together for purposes of calculating your remaining available leave.  For example, if you had previously taken 8 weeks of Medical Leave in the 12-month period, then you would have 4 weeks of remaining Medical and Family Leave available.

Any Family Leave taken due to the birth of a newborn child or the placement of an adopted or foster care child with an employee must be concluded within one year of the birth or placement of the employee's child.  Family Leave for the birth or adoption of a child generally must be taken in minimum increments of at least two weeks, although employees will be allowed two exceptions for leaves of at least one day and less than two weeks.

21

Page 21

## Family Leaves

This company prefers that Family Leaves to care for seriously ill children, spouses, or parents be taken in single increments, or minimum increments of at least two weeks. However, if your health care provider determines it to be medically necessary to accommodate the medical needs of your seriously ill family member, you may take your Family Leave in the increments of shorter duration or on a reduced work schedule. If your Family Leave will require intermittent leaves or a reduced work schedule, then we may require you to transfer temporarily to an alternative position that will provide you with equivalent pay and benefits and better accommodate your recurring periods of leave or reduced work schedule.

Non-Paid Leave: Family Leaves are granted on a non-paid basis. However, should you so desire, you may elect to use any accrued vacation time or personal days to continue your compensation during any otherwise unpaid portion of your Family Leave.

Accrual of Benefits: If you are eligible for coverage under our group health insurance plan, then the company will maintain your group health benefits during the first 12 workweeks of any leaves of absence you take during the relevant 12-month period for disabilities due to pregnancy, childbirth or related medical conditions, other disabilities, or family care, on the same terms and conditions of coverage that would prevail had you not gone on leave. You must continue to take your normal premium contribution during your leave. Payments must be made by the first of each month and should be sent to Premier Displays & Exhibits. Failure to pay your share of premiums may result in the cancellation of your coverage. Please note that if you fail to return to work after your Family Leave for reasons other than the continued serious health condition of your family member, we will be entitled to recover from you any health insurance premiums that we paid on your behalf.

Employees out on Family Leave will not accrue vacation pay, personal/sick days or be eligible for holiday or anniversary day pay during the term of their leave.

## Procedures for Requesting Leave

Employees who wish to take a Pregnancy Disability, Medical or Family Leave should notify the Operations Manager as soon as they know of their need for such leave, and then complete a Request for Pregnancy Disability, Medical or Family Care Leave form, and return it to the Operations Manager.

If the need for your Pregnancy Disability, Medical or Family Leave is foreseeable (for example, if you know you are going to need a leave of absence because of the expected birth or placement of an adopted child, or planned medical treatment), you should provide us with at least 30 days' notice before your leave is to begin of your intention to take a Pregnancy Disability, Medical or Family Leave. Notwithstanding the foregoing, if the birth or placement of your child, or the date of your medical treatment or the medical treatment of a seriously ill family member, requires your leave to begin in less than 30 days, you will be entitled to take a Leave, but you should still provide us with as much notice as is practicable. If you are required to take a Pregnancy Disability, Medical or a Family Leave and the need for such leave is foreseeable, then you should make every reasonable effort to schedule your leave, your treatment, or the treatment for your seriously ill family member, so as to minimize the disruption of our operations.

20

Page 22

Frazier Disalvo & Exhibits                                    Employee Orientation Handbook

## Procedures for Requesting Leave

If you wish to take a Pregnancy Disability, Medical or Family Leave due to your own temporary disability or the serious health condition of a family member, then we may require you to furnish a doctor's certificate specifying (a) the date, if known, on which your temporary disability, or the serious health condition of your family member, commenced, (b) the probable duration of your condition or the serious health condition of your family member, (c) an estimate of the time which the doctor believes you will need to care for your seriously ill family member, (d) in the event of Pregnancy Disability, a statement from your physician that because of the disability, you are unable to perform any one or more of the essential functions of your position without undue risk to yourself, the successful completion of your pregnancy, or to other persons, and (e) in the event of a Family Leave, a statement that the serious health condition of your family member warrants your participation to provide care during the period of the treatment or supervision of the seriously ill family member.  If you request intermittent leave or leave on a reduced time schedule, then we may also ask you to provide certification of the medical necessity for either kind of leave and its expected duration.

We will respond to any request for Pregnancy Disability, Medical or Family Leave as soon as possible, and in any event within ten (10) days after you have made your request and provided any certification required under this policy.

## Reinstatement Rights

Except when business circumstances require (and the law authorizes), a different result, employees who take Pregnancy Disability, Medical or Family Leaves and comply with the provisions of this policy will be guaranteed re-employment upon expiration of their approved leave, provided that their total Leave does not exceed the amounts specified above.  Employees returning from Pregnancy Disability, Medical or Family Leaves will be reinstated to their original position or to a position which is comparable in terms of pay, benefits, working conditions and perquisites, and involves substantially similar duties and responsibilities requiring substantially equivalent skill, effort and authority, which can be performed at the same or a geographically proximate location.  You will retain your employment status during your Leave, and your absence will not be considered a break in service for purposes of determining seniority.  Upon returning from your Leave, you will be credited with all seniority and service accrued before your leave commenced.

While you are out on leave, we may ask you from time to time to update us on the status of your leave and/or on your intent to return to work.  If you are returning from a Pregnancy Disability Leave or Medical Leave, you will be required to provide a doctor's certificate verifying that you are able to safely perform the essential functions of your job, or can do so with reasonable accommodation.

## Compliance and Interpretation

Our Family and Medical Leave policy is intended to comply with and implement the requirements of the California Family Rights Act and the federal Family and Medical Leave Act of 1993, as amended.  In the event of any ambiguity in interpreting this policy, the foregoing statutes will be referred to for guidance.

23

Page 23

Premier Displays & Exhibits                                    Employee Orientation Handbook

## U.S. Military Duty

Leaves of absence and re-employment resulting from service in the U.S. Military Armed Forces will be in accordance with applicable State and Federal laws.

If you are assigned to a U.S. Military Armed Forces Reserve organization and are subject to two (2) weeks annual training, you will be compensated the difference between your base pay and military pay up to a maximum of two weeks per year. If you are called up for active duty, you may, at your option, request and receive any accrued vacation pay.

A copy of the official military orders must accompany your request for such leaves of absence.

## Jury Duty or Witness Leave

Upon receiving a Jury Duty Notice, you must submit a written request to your immediate Supervisor specifying the dates you will be serving as a juror. Proof of such notice is to be submitted prior to taking such leaves, and will be forwarded to management for retention in your personnel file. Jury duty absence is unpaid.

## Subpoenas

You will be paid your normal wage if called upon via a subpoena to appear in court on Company business or on matters in which you are not personally involved as a party in the legal action.

You will not be paid for your time off if summoned to appear in court via a subpoena on matters other than Company business or on matters in which you are a personally involved party in the legal action.

## Time Off to Vote

In accordance with State Election Code, Premier Displays & Exhibits will give each employee, who is a registered voter, sufficient time off from work, without loss of pay, to allow him or her to vote at any general, direct primary or presidential election under the following conditions:

1.   Your working schedule is such that you would not have sufficient time off to vote without taking work time off;

2.   No more than two (2) hours of time is taken off from work;

3.   The voting time off is taken only at the beginning or end of the regularly scheduled working shift, whichever allows for the most free time for voting and the least time off from the regular         working shift;

4.   If you have reason to believe that time off will be necessary to be able to vote on election day and you have given your immediate Supervisor not less than two (2) working days notice that       time off for voting is desired.

You will normally always have sufficient voting time outside of working hours. Any request for paid time off to vote, therefore, must always be reviewed with your Supervisor prior to granting such a request.

Page 24

## School Activities

If it becomes necessary for an employee who is the parent or guardian of a child to attend the child's school to discuss possible suspension or, if a parent or guardian wishes to attend a school function, the employee should alert his or her supervisor as soon as possible so that alternative arrangements may be made.

Absence is subject to the following provisions:

1. Parents, guardians or grandparents having custody of one or more children in kindergarten or grades 1 to 12 may take time off for a school activity.

2. The time off for school activity participation cannot exceed eight (8) hours in any calendar month, or a total of 40 hours each school year.

3. Employees must provide as much advance notice as possible to their supervisor.

4. If both parents are employed by the company, the first employee to request such leave will receive the time off. The other parent will receive the time off only if the leave is approved by his/her supervisor.

5. Employees must use accrued, unused vacation hours, if available, in order to receive compensation for this time off.

6. Employees who do not have paid time off available will take the time off without pay.

25

Premier Displays & Exhibits                                    Employee Orientation Handbook

# Employee Relations

## Personnel Records and Employee Information

Your personnel records are considered confidential and access to such records is limited. It is the Company's intent to ensure your right to inspect such personnel files which are used or have been used in making certain employment decisions regarding your employment with Premier Displays & Exhibits.

The Company maintains files of current and former employees consistent with its own needs and in order to comply with legal requirements.

The Company will attempt to restrict disclosure of your personnel file to authorized individuals within the company. Any request for information from personnel files must be directed to management.

Disclosure of personnel information to outside sources will be limited. However, the Company will cooperate with requests from authorized law enforcement or local, state or federal agencies conducting official investigations and as otherwise legally required.

Employees may request and receive a copy of any document containing your signature.

## Change of Personal Information

It is important that all of the personal information about each employee be up to date at all times. Please notify management immediately, in writing, any time your address, telephone number, marital status, name, number of dependents or other important personal information changes.

## Employee Meetings

Attendance at scheduled employee meetings is crucial as important matters will be discussed. Your attendance is required because we want your constructive ideas in developing solutions to problems that need correction. The meetings are held for your benefit as well as the benefit of the entire Company.

## Company Sponsored Social Events

Premier Displays & Exhibits periodically may sponsor social activities that are made available to employees and members of their immediate families. The purpose of these events is to promote fellowship among our employees and their families.

Participation in any off-duty, Company sponsored social activity is on a purely voluntary basis. No one is required to participate and these activities, when they occur, do not constitute a part of any employee's work related duties.

It should be noted, therefore, that any injuries that may be incurred during Company sponsored social activities may not be covered by workers' compensation insurance.

26

Page 28

**Personal Telephone Calls**

There may be emergency situations where it is necessary for your friends or relatives to telephone you at work; however, personal calls are to be limited and restricted to emergencies only.

**Mail**

Due to the large volume of mail we handle, the Company cannot be responsible for personal mail addressed to you in care of the Company. Please arrange to have your personal mail sent to your home to avoid delay and possible loss.

**Parking**

Parking lots are maintained for use by our employees. This Company, at it's discretion, may assign specific parking spaces to groups or individuals and change them as necessary.
The company does not assume responsibility for your vehicle, be sure to take appropriate precautions.

**Smoking Policy**

Smoking is not allowed in any enclosed area of the facility, per California Labor Code section 6404.5.

**Company Property**

Everything on this property with the exception of employee's personal property and client's property, is Company property and must be maintained according to Company rules and regulations. It must be maintained in good working order, and used only for work related purposes and safeguarded against damage or loss.
The Company reserves the right to inspect all Company property or any property brought on to the premises to insure compliance with its rules and regulations, without notice to the employee and/or in the employee's absence.
No Company property may be removed from the premises without prior approval of a Manager.

**Entrustment**

From time to time certain employees will be entrusted with keys, cell phones and/or other Company owned property.

**Issuance and Surrender**

Company owned items may be issued by the Operations Manager or your supervisor. Employees must surrender all such property to the Operations Manager on demand or upon termination of employment for any reason. Duplication of any key by any employee may not be made without the prior express consent of the Operations Manager.

**Security**

The security of facilities as well as the welfare of our employees requires that every individual be constantly aware of potential security risks. You should immediately notify your supervisor if you notice anything unusual or unknown persons are acting in a suspicious manner, in or around the facilities. Report any lost or misplaced keys immediately.

27

Page 27

Frontier Display & Exhibit                                   Employee Orientation Handbook

## Company Property

### Company Vehicles

Company vehicles may be driven only by designated employees. No employee is permitted to lend any Company-owned vehicle to anyone without the express authorization from management. Any mechanical defects should be reported to your supervisor for appropriate action prior to operation of a vehicle.

All employees authorized to drive Company vehicles, for any purpose, must provide proof of insurance, possess a valid state drivers license and have a driving record which is acceptable to the company's insurance carrier.

Employees hired or placed into positions requiring the use of Company vehicles will have their Department of Motor Vehicles (DMV) records checked by the Company's insurance carrier at the time of employment or placement into these positions and then annually thereafter. Employees in these positions who are uninsurable or who become uninsurable (based on the standards of the insurance carrier) due to an unsatisfactory DMV record or whose drivers licenses are suspended or revoked will not be allowed to drive company vehicles.

### Company Information Technology and Communications Systems

The Company's telephones, cell phones, voice mail, fax and copy machines, computers, software, data storage devices, scanners, printers, all media containing intellectual property and data, local area networks, email and internet access are Company property and are to be used for business purposes only.

The Company reserves the right to monitor and control the use of all such devices and all related equipment. The Company may at it's sole discretion, grant or deny individual employees or groups of employees, access to and use of any of this equipment.

Copying or removing media or electronically transmitting files containing intellectual property, data, drawings, designs, plans, software, images or confidential material from the Company premises is strictly forbidden without management's prior approval.

**NOTE: Information, files, data, messages, etc., received, transmitted or stored on Company owned equipment are not private.**

No right of privacy of personal information or messages should be expected or assumed.

Premier Displays & Exhibits                                                 Employee Orientation Handbook

## Company Property

### Computers

Company owned computers are for business use only. Generally, computers are provided and assigned to individual employees. Passwords are issued to individual employees to provide security and protection for the employee and the Company's information.

Users are responsible to safe-guard their assigned computer, it's contents and it's access to the server by keeping passwords confidential and deny access to all others.

Where cross training of use occurs within a department, they may be shared with the Manager's approval.

Computers are provided with job-appropriate software and fully functional for the intended use. User changes, alterations or additional software are not necessary to produce satisfactory work in an efficient and expected manner. Do not make changes or add unnecessary programs or utilities. Changes and additional programs often use up resources, hereby slowing down overall performance and your productivity. Contact your Supervisor and the Operations Manager to request approval for changes or additional software.

### Voice mail, email copy and fax

Voice mail, e-mail, copy and fax machines are to be used for business purposes only. The Company reserves the right to monitor voice mail messages and access e-mail messages in the normal course of business and to ensure compliance, without notice to the employee and/or to the employees absence.

The Company's voice mail, e-mail, copy and fax machines should not be used for personal gain, non-job related activities or in ways that are disruptive, offensive to others, or harmful to morale. For example, political issues, sexually explicit messages, ethnic slurs, racial epithets or anything else that might be construed as harassment or disparagement of others based on race, national origin, marital status, sex, sexual orientation, age, religious beliefs, or any other characteristic protected under federal or state law may not be transmitted.

### Internet Access

Internet access is for Company business only. The use of the Company's internet access for personal gain or for non-job related activities is strictly forbidden. Employees are also prohibited from downloading files or materials for personal use or entertainment, adding unnecessary screen savers, helpers, buddies, etc., subscribing to "streaming" services, answering or offering solicitations including but not limited to, chat rooms, personal services, religious or political causes. Also, displaying, transmitting and/or downloading sexually explicit images, messages, ethnic slurs, racial epithets or anything which could be construed as harassment or disparaging to others as protected under federal or state law.

Consistent with applicable federal and state law, the time you spend on the internet is tracked through activity logs for business purposes. All abnormal activity will be investigated thoroughly and could result in disciplinary action up to and including termination.

29

Page 29

Premier Displays & Exhibits                                    Employee Orientation Handbook

## Employee Health and Safety

Your safety is a major concern in our Company. The Company strongly believes that a clean, safe and healthy environment should be provided for all employees. Reasonable precautions are taken to provide you with a safe place to work. Injury prevention, however, is largely an individual responsibility, and all employees are expected to consistently do their part to work safely.

Those with the responsibility for overseeing and implementing the *Injury and Illness Prevention Program (IIPP)* at our Company realize this is an important aspect of our responsibilities. The Company is committed to helping all employees understand the high priority placed on maintaining a safe and healthy working environment. In compliance with California law and to promote the concept of a safe workplace, the Company maintains an IIPP.

Certain violations of rules are so serious that they could result in your immediate termination. However, the Company may elect to utilize forms of corrective discipline that are less severe than termination in certain cases. Repeated violations cannot and will not be tolerated.

We pride ourselves on safety. The Company's goal is to have no work related injuries. But, if you are injured, you are expected to report it to your supervisor immediately. Likewise, if you observe an unsafe work condition, report it immediately.

When an employee is involved in an on-the-job accident and/or incurs a work related injury, the Company reserves the right to require an immediate medical examination of the employee involved, at Company expense.

It is the responsibility of each supervisor to prepare a written report of the accident, to be retained in the Company's files, providing all information required to facilitate proper record keeping and accident investigation. All accidents will be investigated by the employee's immediate supervisor.

Management will keep all written records of on-the-job accidents and injuries as required by state law, federal law and the Company's workers' compensation carrier. Medical bills cannot be paid by the insurance company unless there is an accident report on file.

Regardless of whether or not the accident requires medical attention, the accident must be reported so that corrective action can be taken to prevent further accidents of the same kind. If the accident involved any question of safety practices or equipment, the fault should be corrected before the procedure resumes.

30

Page 30

## Employee Health and Safety

### Housekeeping

We want to keep Premier Displays & Exhibits a safe and pleasant place to work. It is important that you understand and fulfill your responsibility to the Company and to your fellow employees when it comes to housekeeping.

Compliance with Fire and Safety laws and regulations must be maintained at all times.

Keep aisles and doorways clear at all times.

Clean up your area after each rest period or meal period and at the end of each day.

In general, it is for the safety and benefit of everyone that we keep Premier Displays & Exhibits clean and orderly. Everyone must do their part.

### OSHA Compliance

The Company will attempt to comply with all Occupational Safety and Health Administration (OSHA) requirements. Because such rules and regulations are so extensive, each employee, supervisor, and manager is strongly advised to consult with management on any safety issue.

The Company will cooperate with all reasonable OSHA and Cal-OSHA inspections and compliance reviews. Management will be present at such inspections or reviews, along with other appropriate supervisory personnel.

### Alcohol and Drugs

Clearly, the possession, distribution, sale, purchase and/or use of drugs and alcohol in the work place is contrary to our concern for the health, safety, and well being of all Company personnel. It is the Company's policy, therefore, that the possession, distribution, sale, purchase and/or use of alcoholic beverages and controlled substances (illegal drugs) by employees during working hours on Company property is prohibited. For the purposes of this policy, "working hours" include rest periods and meal periods.

The legal use of prescribed drugs, consistent with the prescribing doctor's instruction, is not prohibited. Also, the use of over-the-counter drugs is permitted. While these drugs may be legally obtained and used, many of them may cause a sleep inducing or narcotic effect. If you are taking or anticipate taking any legal drugs that may affect your ability to perform your job, please notify your supervisor of the situation.

The Company retains the right to search and inspect all Company owned property and premises, including common areas used by employees, to detect the presence of illegal drugs or alcohol. Company owned property includes, but is not limited to machinery, equipment, furniture, lockers, buildings, and vehicles.

Any employee who is found to be using, possessing, selling, purchasing and/or distributing drugs or alcohol in violation of the terms of this policy will be subject to disciplinary action, up to and including termination. Additionally, where a violation of the law may have occurred, the Company may refer such illegal activities to appropriate law enforcement authorities for further action. Violation of the rules and standards of conduct will not be tolerated.

We will attempt to ensure all of our employees against arbitrary actions in the enforcement of this policy. The circumstances surrounding any reported violation of this policy will be reviewed and investigated to determine the extent of the violation prior to a final decision being made regarding disciplinary action.

Page 31

## Premier Displays & Exhibits

## Employee Handbook
## ACKNOWLEDGMENT FORM

I have received a copy of Premier Displays & Exhibit's Employee Orientation Handbook. I understand and agree that I must read and fully abide by the rules of conduct and other personnel policies set forth in the Employee Orientation Handbook as a condition of my employment.

I understand the Employee Orientation Handbook is presented as a guide for employees and contains descriptions and explanations of rules, procedures, and benefits available to employees at the time of my employment. Except as otherwise expressly stated, such rules, procedures, and benefits may be changed, amended or modified by the Company at any time.

Further, I understand that as a matter of Company policy, every aspect of my employment relationship with Company is on an at-will basis, meaning that I or the Company may terminate my employment at any time, for any reason, with or without cause. As part of this at-will policy, I understand that the Company expressly reserves its inherent authority to manage and control the business enterprise and to exercise its sole discretion to determine all issues pertaining to my employment, including all matters pertaining to promotion, job assignment, the size of the workforce, demotion, transfer and discipline.

I understand that nothing contained in the Company's Employee Orientation Handbook or this Acknowledgment Form shall be construed to modify, change or vary the at-will nature of my employment relationship with the Company or create a contract pertaining to my employment, including employment for a specified period of time. Further, I understand and agree that no one may modify or change the at-will nature of my employment relationship without the full agreement in writing by the Board of Directors.

This publication is the property of Premier Displays & Exhibits and may not be copied or distributed without the express written permission of Premier Displays & Exhibits. Keep this copy of the Employee Orientation Handbook safe from harm or loss. It must be returned to Premier Displays & Exhibits upon termination of employment.

Dated: _____

_____
Employee Signature

_____
Employee Name *(Please Print)*

30

# Mutual Agreement to Arbitrate Claims

I recognize that differences may arise between *Premier Displays & Exhibits* ("the Company") and me during or following my employment with the Company, and that those differences may or may not be related to my employment. I understand and agree that by entering into this Agreement to Arbitrate Claims ("Agreement"), I anticipate gaining the benefits of a speedy, impartial dispute-resolution procedure.

Except as provided in this Agreement, the Federal Arbitration Act shall govern the interpretation, enforcement and all proceedings pursuant to this Agreement. To the extent that the Federal Arbitration Act is inapplicable, California law pertaining to agreements to arbitrate shall apply.

## Claims Covered by the Agreement

The Company and I mutually consent to resolve by arbitration any controversy, claim or counterclaim ("Claims") past, present or future, whether or not arising out of my employment or the termination thereof, which the Company may have against me or that I may have against the Company and/or against it's officers, directors, employees or agents in their capacity as such or otherwise. Any Claim, whether it involves a disagreement about this contract or its meaning, interpretation or application; the performance of this contract; questions of arbitrability as to subject matter of the dispute; whether all agreement to arbitrate exists and if so, whether it covers the dispute(s) in question; or any other question of arbitrability or form of disagreement or conflict among the parties to the contract, shall be submitted to final and binding arbitration. The only Claims that are arbitrable are those that, in the absence of this agreement, would have been justiciable under applicable state or federal law. More specifically, but without limitation, the Claims covered by this Agreement include (1) Claims for wages or other compensation due; (2) Claims for breach of any contract and/or any express or implied covenant contained therein; (3) tort Claims; (4) Claims for discrimination including without limitation any alleged discrimination based on race, sex, sexual orientation, religion, national origin, age, marital status, medical condition, handicap or disability; (5) Claims for sexual harassment; (6) Claims for benefits, except Claims under an employee benefit or pension plan that either (a) specifies that its Claims procedure shall culminate in an arbitration procedure different from this one, or (b) is underwritten by a commercial insurer which decides Claims; and (7) Claims for violation of any federal, state or other governmental law, statute, regulation or ordinance except those Claims specifically excluded hereinbelow.

Except as provided in this Agreement, both the Company and I agree that neither of us shall initiate or prosecute any lawsuit or administrative action in any way related to any Claim covered in this Agreement.

## Claims Not Covered by this Agreement

Claims I may have for workers compensation or unemployment compensation benefits are not covered by this Agreement.

Claims by the Company for injunctive relief, equitable relief and/or other provisional relief, including, without limitation, Claims for unfair competition, the unauthorized use and/or disclosure of trade secrets and/or other unfair business practices are not covered by this Agreement. In these instances, the Company may seek and obtain relief from a court of competent jurisdiction.

This Agreement does not bar me from filing, in good faith, an administrative charge of discrimination with the Equal Employment Opportunities Commission, as provided by law.

37

1

Premier Displays & Exhibits                                                  Mutual Agreement To Arbitrate Claims

### Required Notice of All Claims and Statute of Limitations

The Company and I agree that the aggrieved party must serve a written notice of any Claim on the other party no later than one (1) year after the event giving rise to the Claim, or such shorter period as may be prescribed by law. Otherwise, the Claim shall be void and deemed waived even if there is a federal or state statute of limitations which would have given more time to pursue the Claim.

Written notice to the Company, or its officers, directors, employees or agents, shall be sent to *Premier Displays & Exhibits* at 11261 Warland Drive, Cypress, California 90630. I will be given written notice at the last address recorded in my personnel file.

The written notice shall identify and describe the nature of each and every Claim asserted and the facts upon which such Claims are based. The notice shall be served on the other party by certified or registered mail, return requested.

### Commencement of Arbitration

Except for good cause, or in the case of emergency, as determined by the Arbitrator, the arbitration hearing shall commence within ninety (90) days after the service of the written notice of a Claim and shall proceed during each business day thereafter until concluded. The mutual intent of this provision is to prevent breaks and disruptions in the hearing process except for unusual and unanticipated circumstances.

### Representation

Any party may be represented by an attorney or other representative selected by the party.

### Discovery

Each party shall have the right to make a demand for production of documents to any party to the Arbitration. All demands for production of documents must be served no later than twenty (20) days after the date of service of the written notice of Claim. All documents shall be produced in response to any demand no later than ten (10) days after receipt of the demand by the party to whom the demand is made.

Each party shall have the right to take the deposition of one individual and any expert witnesses designated by any other party. All notices of deposition of any percipient witness shall be served no later than forty-five (45) days after service of the written notice of Claim. Additional discovery may be conducted only where the Arbitrator so orders, upon a showing of substantial need, or where the parties otherwise agree in writing.

### Designation of Witnesses

At least thirty (30) days before the Arbitration, the parties shall exchange witness lists, including any experts, and copies of all exhibits which they intend to use at the Arbitration.

### Subpoenas

Each party shall have the right to subpoena witnesses and documents during discovery and for the Arbitration.

34

2

## Arbitration Procedures

The Arbitration will be held under the auspices of the American Arbitration Association ("AAA"), with the designation of the sponsoring organization to be made by the party who did not initiate the Claim.

The Company and I agree that, except as provided in this agreement, the Arbitration shall be in accordance with the AAA's then-current Model Employment Arbitration Procedures. The arbitrator shall be either a retired judge or an attorney licensed to practice law in the state in which the arbitration is convened ("the Arbitrator"). The Arbitration shall take place in the county where I am presently employed by the Company or when I was last employed by the Company.

*The Arbitrator shall be selected as follows: The sponsoring organization shall give each party a list of eleven (11) Arbitrators drawn from its panel of employment dispute arbitrators. Each party may strike all names on the list it deems unacceptable. If only one common name remains on the lists of all parties, that individual shall be designated as the Arbitrator. If more than one common name remains on the lists of all parties, the parties shall strike names alternately from the list of common names until only one remains. If no common name exists on the lists of all parties, the sponsoring organization shall furnish an additional list and the process shall be repeated. If no Arbitrator has been selected after two lists have been distributed, then the parties shall strike alternately from a third list, with the party initiating the Claim striking first, until only one name remains. That person shall be designated as the Arbitrator.*

The Arbitrator shall apply the substantive law (and the law of remedies, if applicable) of the state in which the Claim arose, or federal law, or both, as applicable to the Claim(s) asserted. The Arbitrator is without jurisdiction to apply any different substantive law or law of remedies. The California Rules of Evidence shall apply. The Arbitrator, and not any federal, state or local court or agency, shall have the exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Agreement, including but not limited to any Claims that all or any part of this Agreement is void or voidable. The Arbitration shall be final and binding upon the parties except as provided in this Agreement.

The Arbitrator shall have jurisdiction to hear and rule on pre-hearing disputes and is authorized to hold pre-hearing conferences by telephone or in person, as the Arbitrator deems necessary. The Arbitrator shall have the authority to entertain a motion to dismiss and/or a motion for summary judgment by any party and shall apply the standards governing such motions under the Federal Rules of Civil Procedure.

Either party, at its expense, may arrange for and pay the cost of a court reporter to provide a stenographic record of proceedings.

Either party, upon request at the close of hearing, shall be given leave to file a post-hearing brief. The time for filing such a brief shall be set by the Arbitrator.

The Arbitrator shall render an award and opinion in the written form typically rendered in labor Arbitrations.

Either party shall have the right, within twenty (20) days of issuance of the Arbitrator's proposed opinion, to file with the Arbitrator a motion to reconsider (accompanied by a supporting brief), and the other party shall have twenty (20) days from the date of the motion to respond. The Arbitrator thereupon shall reconsider the issues raised by the motion and, promptly, either confirm or change the decision, which (except as provided by this Agreement) shall then be final and conclusive upon the parties. The costs of such a motion for reconsideration and written opinion of the Arbitrator shall be borne by the party prevailing on the motion, unless the Arbitrator orders otherwise.

35

3

## Arbitration Fees and Costs

The Company and I shall equally share the fees and costs of the Arbitrator, provided, however, that my maximum contribution will be no more than 20% of the amount at issue in the Claim. Each party will deposit funds or post other appropriate security from its share of the Arbitrator's Fee, in an amount and manner determined by the Arbitrator, ten (10) days before the first hearing. Each party shall pay for its own costs and attorneys' fees, if any. However, if any party prevails on a statutory Claim which affords the prevailing party attorneys' fees, or if there is a written agreement providing for fees, the Arbitrator may award reasonable fees to the prevailing party.

## Judicial Review

Either party may bring an action or file a motion in any court of competent jurisdiction to compel Arbitration under this Agreement, to enter judgment pursuant to an Arbitration award and to collect an Arbitration award. No party shall have the right to appeal an Arbitration award except as provided by federal or state law.

## Interstate Commerce

I understand and agree that the Company is engaged in transactions involving interstate commerce.

## Requirements for Modification or Revocation

This Agreement to Arbitrate shall survive the termination of my employment and the expiration of any benefit plan. It can only be revoked or modified by a writing signed by the parties which specifically states an intent to revoke or modify this Agreement.

## Sole and Entire Agreement

This is the complete Agreement of the parties on the subject of Arbitration of disputes (except for any Arbitration Agreement in connection with any pension or benefit plan). This Agreement supersedes any prior or contemporaneous oral or written understandings on the subject, no party is relying on any representations, oral or written, on the subject of the effect, enforceability or meaning of this Agreement, except as specifically set forth in this Agreement.

## Construction

If any provision of this Agreement is adjudged to be void or otherwise unenforceable, in whole or in part, such adjudication shall not affect the validity of the remainder of the Agreement.

## Consideration

The mutual promises by the Company and by me to Arbitrate our differences, as provided herein, rather than litigate them before courts or other bodies, provides mutual consideration to each other necessary for the enforcement of this Agreement.

## Not an Employment Agreement

This Agreement is not, and shall not be construed to create, any contract of employment, express or implied. Nor does this Agreement in any way alter the "at-will" status of my employment.

36

Premier Displays & Exhibits                                 Mutual Agreement To Arbitrate Claims

**Confidentiality**

The parties agree that it is in their mutual best interests to keep confidential the nature of any controversy, claim or counterclaim which has or may heretofore arise between them and the result of any Arbitration of any Claim. Neither party shall disclose the nature of any Claim, controversy or counterclaim nor the result of any Arbitration to any third party with the exception of professionals engaged to prepare for any Arbitration or as required by any binding contract, applicable law, court order or as necessary to enforce any Arbitration award. Each party acknowledges that the confidentiality provision set forth herein is material consideration to the other party for entering into this Agreement.

**Voluntary Agreement**

I ACKNOWLEDGE THAT I HAVE CAREFULLY READ THIS AGREEMENT, THAT I UNDERSTAND ITS TERMS, THAT ALL UNDERSTANDINGS AND AGREEMENTS BETWEEN THE COMPANY AND ME RELATING TO THE SUBJECTS COVERED IN THE AGREEMENT ARE CONTAINED IN IT, AND THAT I HAVE ENTERED INTO THE AGREEMENT VOLUNTARILY AND NOT IN RELIANCE ON ANY PROMISES OR REPRESENTATIONS BY THE COMPANY OTHER THAN THOSE CONTAINED IN THIS AGREEMENT ITSELF.

I UNDERSTAND THAT BY SIGNING THIS AGREEMENT I AM GIVING UP MY RIGHT TO A JURY TRIAL.

I FURTHER ACKNOWLEDGE THAT I HAVE BEEN GIVEN THE OPPORTUNITY TO DISCUSS THIS AGREEMENT WITH MY PRIVATE LEGAL COUNCEL AND HAVE AVAILED MYSELF OF THAT OPPORTUNITY TO THE EXTENT I WISH TO DO SO.

DAVID COGSWELL

11.23.04

Premier Displays & Exhibits

OPERATIONS MGR.

11-24-04

37

5

**EXHIBIT F**

1    THE KNOX-RAPHAEL LAW FIRM
     Laura Knox-Raphael (S.B.N. 130334)
2    9210 Irvine Center Drive
     Irvine, CA 92618
3    (949) 660-1609

4    Attorney for PREMIER DISPLAYS & EXHIBITS, INC.,
     A California Corporation.

5

6

7

8            UNITED STATES DISTRICT COURT

9            CENTRAL DISTRICT OF CALIFORNIA

10

11    PREMIER DISPLAYS     CASE NO.: SACV09-354JVS (ANx)
     EXHIBITS, INC., A California
12    Corporation,

13        Plaintiff,

14      vs.       PLAINTIFF'S RESPONSES TO
           DEFENDANT EWI WORLDWIDE'S
15            FIRST SET OF INTERROGATORIES

16    DAVID COGSWELL, An
     Individual; COGSWELL DESIGN,
17    INC., A California Corporation;
     DISPLAY FABRICATION GROUP,
18    INC., A California Corporation;
     EWI WORLDWIDE, aka,
19    PRESENTATION WORKS, INC.,
     aka EXHIBITS WORKS, INC., A
20    Michigan Corporation, and DOES 1
     through 50, inclusive,
21

22      Defendants.

23

24    PROPOUNDING PARTY:    Defendant, EWI Worldwide.

25    RESPONDING PARTY:     PREMIER DISPLAYS & EXHIBITS, INC., A
              California Corporation.
26

27    SET NO.:         ONE (1)

28

## PRELIMINARY STATEMENT OF RESPONDING PARTY

Plaintiff PREMIER DISPLAYS & EXHIBITS, INC. (hereinafter "Plaintiff" or "Premier") hereby responds to your First Set of Interrogatories. The following responses are made solely for the purpose of this action. Nothing herein shall be construed as an admission respecting the admissibility, truth, accuracy or relevance of any fact or document, or the truth or accuracy of any characterization or statement of any kind contained in these responses to your First Set of Interrogatories.

It should be noted that responding party has not yet fully completed investigating the facts relating to this case, has not fully completed discovery in this action and has not completed trial preparation. All of the answers contained herein are based only upon such information and documents which are presently available to and specifically known to this responding party and disclose only those contentions which presently occur to such responding party. Plaintiff's responses to the First Set of Interrogatories are limited to information not protected from disclosure by the attorney work-product doctrine, (C.C.P. Section 2018.010 et seq.) the attorney-client privilege, expert information or from premature disclosure contrary to Fed.R.Civ.P., Rule 26.

It is anticipated that further discovery, independent investigation, legal research and analysis will supply additional facts and meaning to the known facts, as well as establish entirely new factual conclusions and legal contentions, all of which may lead to substantial additions to, changes in and variations from the contentions herein set forth.

The following responses are given without prejudice to responding party's right to produce evidence to any subsequently discovered fact or facts which this responding party may later recall. Responding party accordingly reserves the right to change any and all answers herein as additional facts are ascertained, analyses made, legal research is completed and contentions are made. The responses contained herein are made in a good faith effort to supply as much factual information and as much specification of legal contentions as is presently known but should in no way prejudice responding party in relation to further discovery, research and analysis.

## RESPONSES TO INTERROGATORIES (SET ONE)

2

**INTERROGATORY NO. 1:**

"STATE ALL FACTS supporting YOUR contention in paragraph 20 of the COMPLAINT that "[O]n April 1, 2008, Plaintiff Premier terminated the employment of Defendant Cogswell for cause after Plaintiff discovered that Defendant Cogswell had been secretly working, without advance notice or consent of Plaintiff Premier, for competitors of Premier, including...EWI..."

**OBJECTION AND RESPONSE TO INTERROGATORY NO. 1:**

Objection. The interrogatory is objected to, to the extent that the definition furnished at page 5, lines 15-18, requires not only that all facts be set forth, but also any and all witnesses and documents to be described relating to such facts. As such, the interrogatory is burdensome, oppressive and harassing, and as a consequence exceeds the 25 interrogatory limitation of Fed.R.Civ.P. Rule 33. Furthermore, the interrogatory is unduly harassing, oppressive and burdensome, because Defendant has, concurrently with this set of interrogatories, served a request for production of documents that seeks the duplicative production of all documents corresponding to each of the interrogatories served herein as to which a "description" is sought. Accordingly, Plaintiff responds to this interrogatory only to the extent of those facts, opinions, information and evidence of which Plaintiff is aware, that are responsive to the interrogatory. Subject to these objections, Plaintiff respond as follows:

Shortly after March 21, 2008, Plaintiffs' principals, including Stephen Amato, discovered e-mails sent by David Cogswell on or about March 21, 2008, which had been sent to Carter Lee, at EWI a competitor of the Plaintiff without the knowledge or consent of Premier. These designs, identified as Exhibits 9 and 11 of Volume 2 of Mr. Cogswell's deposition taken in this case, included sketches representing a proposed design for the Walt Disney Blue Sky Cellar. Mr. Cogswell had created these designs at some point in time prior to the March 21, 2008 transmission of these e-mails to EWI. The e-mails and attached sketches had also been copied to Tracy Cogswell, David Cogswell's wife, who was then known to be within upper management at EWI. When Mr. Amato confronted Mr. Cogswell with this discovery, Mr. Cogswell admitted that he had created these sketches during his full-time employment for Premier, and that he had in fact sent them to Carter Lee and to his wife, at EWI. At the time these sketches were created, Mr. Cogswell was a full time salaried employee of Premier.

3

1    The Walt Disney Company and Walt Disney Imagineering were also existing clients of Premier at

2    that time. Accordingly, Mr. Cogswell's acts of furnishing the sketches at issue to EWI was to assist

3    a known competitor in gaining employment for profit with one of Premier's existing clients, to

4    Premier's detriment, and was a clear conflict of interest on the part of Mr. Cogswell.

5         Upon admitting that he had in fact prepared and sent these sketches to EWI, Mr. Cogswell, an

6    "at-will" employee of Premier (pursuant to Premier's Employee Handbook at 3), was terminated for

7    cause, based on his violation in so doing of numerous provisions of Premier's policies outlined in the

8    Employee Handbook.

9         Mr. Cogswell had agreed in writing upon his initial hire on or about November 23, 2004, that

10   he was required to abide by all rules and regulations of his employer, Premier. (*See*, Cogswell Depo

11   Vol. 2, Exh. 6). These included the rules set forth in Premier's Employee Handbook, which

12   permitted outside employment unless it was "harmful to the Company's best interests" and did "not

13   present a current or potential future conflict of interest with [Mr. Cogswell's] employment here." The

14   Handbook at page 6 further states that "[e]mployees who may work for Company competitors or

15   subcontractors must notify management in advance in order to prevent possible conflicts of interest."

16   The Handbook further states at page 26 that "[e]verything on this property with the exception of

17   employee's personal property and client's property is Company property and must be maintained

18   according to Company rules and regulations...and must be safeguarded against...loss. [] No Company

19   property may be removed from the premises without prior approval of a Manager." Page 27 of the

20   handbook also states that "electronically transmitting files containing intellectual property, data,

21   drawings, designs, plans...from Company premises is strictly forbidden without management's prior

22   approval."

23        The sketches Mr. Cogswell created was Premier's property under Lab.C. § 2860 and under the

24   Employee Handbook. Mr. Cogswell's transmission of these designs to EWI without Premier's

25   approval, was a material violation of all of the aforementioned rules of Premier enunciated in

26   Premier's handbook. Furthermore, Mr. Cogswell's aforementioned acts further constituted a

27   violation of Premier's "Standards of Conduct," Standards No's 1, 2, 3, 11, 21, and 23, enunciated at

28   pages 7-8 of the Handbook. Mr. Cogswell was therefore terminated and dismissed for cause pursuant

1    to the authority reserved to Premier as explained in Pages 7 and 9 of the Handbook.

2    **INTERROGATORY NO. 2:**

3         "STATE ALL FACTS supporting YOUR contention in paragraph 20 of the COMPLAINT that

4    "...The Walt Disney Company and its affiliate Walt Disney Imagineering [are] active clients of

5    Plaintiff Premier...".

6    **OBJECTION AND RESPONSE TO INTERROGATORY NO. 2:**

7         Objection. The interrogatory is objected to, to the extent that the definition furnished at page

8    5, lines 15-18, requires not only that all facts be set forth, but also any and all witnesses and

9    documents to be described relating to such facts. As such, the interrogatory is burdensome,

10   oppressive and harassing, and as a consequence exceeds the 25 interrogatory limitation of

11   Fed.R.Civ.P. Rule 33. Furthermore, the interrogatory is unduly harassing, oppressive and

12   burdensome, because Defendant has, concurrently with this set of interrogatories, served a request

13   for production of documents that seeks the duplicative production of all documents corresponding

14   to each of the interrogatories served herein as to which a "description" is sought. Accordingly,

15   Plaintiff responds to this interrogatory only to the extent of those facts, opinions, information and

16   evidence of which Plaintiff is aware, that are responsive to the interrogatory. Subject to these

17   objections, Plaintiff respond as follows:

18        From 2004 through 2009, Plaintiff has repeatedly done business with the Walt Disney

19   Company and Walt Disney Imagineering, contracting with both companies to design, fabricate and

20   construct, transport, manage and install exhibits and displays in various environments, including

21   corporate environments, retail environments, park environments. And it continues to do business

22   with The Walt Disney Company and its affiliate Walt Disney Imagineering. This is evidenced by

23   invoices dated, *inter alia*, September 21, 2004, October 26, 2004, September 17, 2008, and March

24   6, 2009, as well as other written contracts entered into between Premier and Disney during the same

25   time period. These invoices and contracts may be produced in a redacted form as Confidential:

26   attorneys eyes only" due to their inclusion of certain confidential and trade secret information once

27   the stipulated productive order has been entered by this Court.

28   ///

**INTERROGATORY NO. 3:**

"STATE ALL FACTS supporting YOUR contention in paragraph 27 of the COMPLAINT that "[W]ithin one year prior to the filing of this action, Plaintiff further discovered that Defendant Cogswell has misappropriated certain trade secrets...from the Plaintiff and has himself exploited and furnished such trade secrets to other competitors of the Plaintiff for use and exploitation in commerce and direct competition against Plaintiff including...EWI...".

**OBJECTION AND RESPONSE TO INTERROGATORY NO. 3:**

Plaintiff incorporates its objection and response to Interrogatory No. 1, above, as though fully set forth herein.

**INTERROGATORY NO. 4:**

"STATE ALL FACTS supporting YOUR contention in paragraph 40 of the COMPLAINT that "[I]n or about March, 2008...David Cogswell...created a design for the Walt Disney Imagineering Blue Sky Cellar Theatre...".

**OBJECTION AND RESPONSE TO INTERROGATORY NO. 4:**

Plaintiff incorporates its objection and response to Interrogatory No. 1, above, as though fully set forth herein.

**INTERROGATORY NO. 5:**

"STATE ALL FACTS supporting YOUR contention in paragraph 40 of the COMPLAINT that "...Cogswell secretly furnished and provided said Walt Disney Blue Sky Cellar design (including, but not limited to, handwritten sketches and/or drawings, artist renderings, computer aided drawings and graphics, graphic designs and artwork, engineering drawings, and material specifications) to Defendant EWI..., who at such time knew and was aware that said design had been created by Cogswell while a full-time employee of Plaintiff, acting within the scope and course of said employment...".

**OBJECTION AND RESPONSE TO INTERROGATORY NO. 5:**

Plaintiff incorporates its objection and response to Interrogatory No. 1, above, as though fully set forth herein. Tracy Cogswell, David Cogswell's wife, was upper level management at EWI, and as such she and EWI were therefore clearly aware of Ms. Cogswell's improper actions undertaken

1  on or about March 21, 2008.

2  **INTERROGATORY NO. 6:**

3      "STATE ALL FACTS supporting YOUR contention in paragraph 40 of the COMPLAINT that

4  "...pursuant to Cal. Lab. C. §2860, the Walt Disney Imagineering Blue Sky Cellar/Theatre was at all

5  times the intellectual property of the Plaintiff", and at the time of the alleged misappropriation by

6  Defendants Cogswell and EWI, "The Walt Disney Company and its affiliate Walt Disney

7  Imagineering were clients of Plaintiff, Premier."

8  **OBJECTION AND RESPONSE TO INTERROGATORY NO. 6:**

9      Plaintiff incorporates its objection and response to Interrogatory No. 1, above, as though fully

10  set forth herein. Lab.C. § 2860 speaks for itself.

11  **INTERROGATORY NO. 7:**

12      "STATE ALL FACTS supporting YOUR contention in paragraph 18 of the COMPLAINT that

13  "EWI was knowingly and purposefully furnished by Cogswell with, and accepted from Cogswell,

14  other designs (including, but not limited to, handwritten sketches and/or drawings, artist renderings,

15  computer aided drawings and graphics, graphic designs and artwork, engineering drawings, and

16  material specifications) for competitive displays and exhibits similar to the Walt Disney Imagineering

17  Blue Sky Cellar/Theatre design, which designs Cogswell misappropriated from Plaintiff and/or

18  created while a full-time employee of the Plaintiff, which designs were therefore the intellectual

19  property of the Plaintiff pursuant to Cal. Lab. C. §2860...".

20  **OBJECTION AND RESPONSE TO INTERROGATORY NO. 7:**

21      Plaintiff incorporates its objection and response to Interrogatory No's. 1 and 5, above, as

22  though fully set forth herein. In addition, Cogswell has admitted during his deposition (Vol. 1, pages

23  52 - 66) in this case to misappropriating photographs owned by Premier and a client list onto a

24  portable memory device; he further has admitted to deleting "personal photographs", emails, projects

25  and client lists from the lap top, owned by Premier and utilized by Cogswell during his employment

26  with Premier, at the time he was terminated from Premier's employment on April 1, 2008. This

27  deletion was unauthorized and constituted multiple violations of the provisions in Premier's

28  employee handbook. From this spoliation of evidence by Cogswell, which occurred in connection

with discovery of the  misappropriation of the Blue Sky Cellar design by Cogswell and EWI, reasonable inferences arise that Cogswell and EWI also misappropriated other designs from Premier, which were the subject of the spoliation to prevent discovery of these further misappropriations by Premier.

## INTERROGATORY NO. 8:

"STATE ALL FACTS supporting YOUR contention in paragraph 43 of the COMPLAINT that "...EWI, also misappropriated Plaintiff's Customer List Data, and [has] employed such Customer List-Related Data to compete against Plaintiff...".

## OBJECTION AND RESPONSE TO INTERROGATORY NO. 8:

Plaintiff incorporates its objection and response to Interrogatory No's. 1,  5 and 7, above, as though fully set forth herein.  Mr. Cogswell has admitted during his deposition (Vol 1, page 54) taken in this case that after his termination, while he was cleaning out his desk, he downloaded Premier's customer data and lists onto his flash drive.  He admitted that he did this without Premier's knowledge or permission. (Vol 1, page 57).  This was a further violation of Premier' rules as set forth in the Handbook, including the prohibitions against transfer of electronic data (Handbook, p. 27) and the Standards of Conduct.

## INTERROGATORY NO. 9:

"STATE ALL FACTS supporting YOUR contention in paragraph 18 of the COMPLAINT that YOUR "...[alleged] trade secrets derived independent economic value from not being generally known to the public or to others who could obtain economic value from their disclosure or use and were the subject of efforts that were reasonable under the circumstances to maintain their secrecy."

## OBJECTION AND RESPONSE TO INTERROGATORY NO. 9:

Plaintiff incorporates its objection and response to Interrogatory No's. 1,  5 and 7, above, as though fully set forth herein.  The Blue Sky Cellar sketches secretly supplied by Cogswell to Carter Lee and Tracy Cogswell at EWI were actually used by EWI, Premier's competitor, to build the final product at Disney's California's Adventure, the precise profit for which EWI has refused to disclose in discovery (which is the subject of an impending motion to compel). This axiomatically established their pecuniary value to EWI, Premier's competitor.   Had they not been secretly and illegally

1  transmitted to EWI, they could have enabled Premier to build the Blue Sky Cellar, and earn the

2  profits therefrom which EWI usurped from Premier by accepting Cogswell's sketches.

3  **INTERROGATORY NO. 10:**

4      "STATE ALL FACTS supporting YOUR contention in paragraph 48 of the COMPLAINT that

5  "[t]he continuing use and exploitation by...EWI...of Plaintiff's trade secrets,...without the express or

6  implied consent of Plaintiff and which were acquired secretly and with a duty to limit their use solely

7  to Defendant Cogswell's employment with Plaintiff, constitutes a knowing and intentional

8  misappropriation of Plaintiff's trade secrets...".

9  **OBJECTION AND RESPONSE TO INTERROGATORY NO. 10:**

10      Plaintiff incorporates its objection and response to Interrogatory No's. 1, 5, and 9, above, as

11  though fully set forth herein.

12  **INTERROGATORY NO. 11:**

13      "STATE ALL FACTS supporting YOUR contention in paragraph 49 of the COMPLAINT that

14  "[a]s a direct and legal consequences of the...trade secret misappropriation of Plaintiff's trade secrets,

15  Plaintiff has suffered damages...lost profits, the profits of...EWI...any unjust enrichment, a reasonable

16  royalty and any other damages and monetary relief provided for by Cal.Civ.C. § 3426.3, and

17  California Law."

18  **OBJECTION AND RESPONSE TO INTERROGATORY NO. 11:**

19      Plaintiff incorporates its objection and response to Interrogatory No's. 1, 5, 7, 9, and 10, above,

20  as though fully set forth herein.  EWI is well aware of these damages because it knows what profits

21  (unjust enrichment) it earned on the Blue Sky Cellar display it built at the Disney California

22  Adventure theme park.  Despite EWI's unjustified refusal to date to disclose in discovery the extent

23  and amount of these secret profits (unjust enrichment) EWI earned off of the Blue Sky Cellar designs

24  which were rightfully and lawfully Premier's property to begin with, Plaintiff estimates such profits

25  likely exceeded between $60,000 to $200,000 based upon inspection of final product and evaluation

26  of the materials and labor likely required to complete the project.  Investigation and discovery are

27  continuing.

28  ///

THE KNOX RAPHAEL
LAW FIRM

**INTERROGATORY NO. 12:**

"STATE ALL FACTS supporting YOUR contention in paragraph 50 of the COMPLAINT that EWI is "vicarious [sic] liable for the unlawful misappropriation of each of the Defendants and each third party...".

**OBJECTION AND RESPONSE TO INTERROGATORY NO. 12:**

Plaintiff incorporates its objection and response to Interrogatory No's. 1, 5, 7, 9, 10, and 11, above, as though fully set forth herein.

**INTERROGATORY NO. 13:**

"STATE ALL FACTS supporting YOUR contention in paragraph 51 of the COMPLAINT that EWI "...acting with knowledge of misappropriation activity, induced, caused, or materially contributed to the misappropriation and is contributorily liable for the unlawful misappropriation of Plaintiff's trade secrets by each of the other Defendants and each third [party]...".

**OBJECTION AND RESPONSE TO INTERROGATORY NO. 13:**

Plaintiff incorporates its objection and response to Interrogatory No's. 1, 5, 7, 9, 10, and 11, above, as though fully set forth herein.

**INTERROGATORY NO. 14:**

"STATE ALL FACTS supporting YOUR contention in paragraph 52 of the COMPLAINT that "[T]he acts of misappropriation of...EWI...are causing irreparable injury to Plaintiff..."

**OBJECTION AND RESPONSE TO INTERROGATORY NO. 14:**

Plaintiff incorporates its objection and response to Interrogatory No's. 1, 5, 9, 10, and 11, above, as though fully set forth herein.

**INTERROGATORY NO. 15:**

"STATE ALL FACTS supporting YOUR contention in paragraph 53 of the COMPLAINT that, "[t]he actions of...EWI...were, on information and belief, further willful, malicious, fraudulent and oppressive, were despicable and were undertaken with an intent to visit financial and economic harm upon the Plaintiff, and/or with a conscious disregard of Plaintiff's rights..."

**OBJECTION AND RESPONSE TO INTERROGATORY NO. 15:**

Plaintiff incorporates its objection and response to Interrogatory No's. 1, 5, 7, 9, 10, and 11,

1   above, as though fully set forth herein.

2   **INTERROGATORY NO. 16:**

3       "STATE ALL FACTS supporting YOUR contention in paragraph 54 of the COMPLAINT that

4   "...conduct of...EWI..., including the knowing and intentional fabrication, construction, and sale of

5   displays and exhibits using Plaintiff's designs secretly stolen and misappropriated from Plaintiff,

6   which displays and exhibits were then sold to Plaintiff's own clients and customers, each involved

7   the investment of hundreds of thousands of dollars in developmental costs requiring the investment

8   of risk capital to such an extent that such conduct was the product of the entire corporate management

9   and corporate policy of...EWI..., such that...EWI,...approved, ratified, condoned, authorized, and

10  accepted the benefits from the wrongful conduct of each of their individual employees and agents

11  who individually committed the acts and omissions complaint of..." by YOU.

12  **OBJECTION AND RESPONSE TO INTERROGATORY NO. 16:**

13      Plaintiff incorporates its objection and response to Interrogatory No's. 1, 5, 7, 9, 10, and 11,

14  above, as though fully set forth herein.

15  ///

16  DATED: September 18, 2009

                      THE KNOX-RAPHAEL LAW FIRM

18                        By:

19                        LAURA KNOX-RAPHAEL,
                      Attorneys for Plaintiff.

## PROOF OF SERVICE

1

2  Premier Displays & Exhibits, Inc. v. Cogswell, et al.
   United States District Court
3  Central District of California Case No. SACV09-354JVS (ANx)

4        I am a resident of and employed in the aforesaid county, State of California; I am over the age
   of eighteen years and not a party to the within action; my business address is 9210 Irvine Center
5  Drive, Irvine, California.

6        On September 21, 2009, I caused to be served the foregoing **PLAINTIFF'S RESPONSES TO**
   **EWI WORLDWIDE INTERROGATORIES, SET ONE** upon the interested parties in this action:
7

8  ( )   **BY ELECTRONIC EMAIL:** I caused such document listed above to be transmitted by
         electronic mail to the e-mail addresses listed below:

9  ( )   **BY ELECTRONIC MAIL:** I electronically filed such document with the Clerk of the Court
         using CM/ECF System, which sent electronic notification of such filing to all other parties
10       appearing on the docket sheet as listed below:

11 (X)   **BY MAIL,** by placing a true copy thereof, in a sealed envelope to the addressee(s) below, and
         depositing the same into the United States mail at the address located set forth hereinabove,
12       with sufficient first-class postage thereon prepaid:

13       Lisa Borodkin, Esq.                              Counsel for Defendant, DISPLAY
         CALLAHAN & BLAIN, APLC                   FABRICATION GROUP, INC.
14       3 Hutton Centre Drive, Ninth Floor
         Santa Ana, CA 92707
15       Telephone: (714) 241-4444
         Facsimile: (714) 241-4445
16       Email:   lBorodkin@callahan-law.com

17       John Selbak, Esq.                               Counsel for Defendants, DAVID
         CORPORATE COUNSEL PARTNERS              COGSWELL and COGSWELL DESIGN,
18       35 North Arroyo Parkway, Suite 240      INC.
         Pasadena, CA 91103
19       Telephone: (626) 689-4383
         Facsimile: (626) 243-4813
20       Email:   JSelbak@corporate-counsel.net

21       Daniel C. DeCarlo, Esq.
         Robert M. Collins, Esq.                         Counsel for Defendant, EWI
22       LEWIS, BRISBOIS, BISGAARD & SMITH, LLP  WORLDWIDE, aka, PRESENTATION
         221 North Figueroa Street, Suite 1200   WORKS, INC., A Michigan Corporation.
23       Los Angeles, CA 90012
         Telephone: (213) 250-1800
24       Facsimile: (213) 250-7900
         Email:   ddecarlo@lbbslaw.com
25                Rcollins@lbbslaw.com

26 ( )   **BY PERSONAL SERVICE,** by personally delivering a sealed envelope, containing the
         above-referenced notice to the addressee(s) listed below:
27

28 ( )   **BY OVERNIGHT PRIORITY MAIL WITH NEXT DAY DELIVERY GUARANTEED**

THE KNOX RAPHAEL
LAW FIRM

by placing a true copy thereof, in a sealed envelope to the addressee(s) below, and depositing the same into the **OVERNITE EXPRESS** mail drop at the address located set forth hereinabove, with postage prepaid.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Dated:          September 21, 2009

LAURA KNOX-RAPHAEL

**EXHIBIT  G**

# THE KNOX ~ RAPHAEL LAW FIRM

Premier v. Cogswell
50027-1120
Correspondence

9210 Irvine Center Drive
Irvine, California 92618
Telephone:(949) 660-1609
Facsimile:(949) 660-1647

Laura M. Knox-Raphael
Attorney at Law

lknox@knoxraphael-law.com

November 9, 2009

**_VIA PERSONAL DELIVERY_**
Robert Collins, Esq.
**LEWIS BRISBOIS BISGAARD & SMITH, LLP**
221 North Figueroa Street, Suite 1200
Los Angeles, CA 90012

       *Re:*   *Premier Displays & Exhibits, Inc. v. Cogswell, et al.*

Dear Mr. Collins:

I am in receipt of your letter of November 5, 2009, received at 8:29 p.m. I want to respond to and clarify several inaccuracies and omissions in your letter.

**Rule 30(b)(6) Deposition of Premier.** First, thank your for confirmation of the deposition schedule. However, my client will not pay for any expedite charges on the deposition. Approximately 3 weeks ago, when we first started discussing EWI taking Premier's Rule 30(b)(6) deposition, you asked me for dates for the deposition, and in response, I informed you that I would need the subject matter categories before I could determine dates for the deposition as Premier may designate several corporate designees to testify, not just Stephen Amato. Within the last fourteen (14)days, you told me that you planned to schedule the Premier deposition for November 12, 2009 (the date my office had scheduled EWI's Rule 30(b)(6) deposition), and I advised that, depending upon the subject matter categories, I could not guarantee that the deposition could proceed on November 12 until we were able to review the subject matter categories and determine the appropriate corporate designee(s) therefrom. In addition, and as we discussed, I advised you, when you mentioned setting my client's deposition for November 12, 2009, that my client's most probable PMK deponent, Stephen Amato, would likely be unavailable for deposition due to a prearranged business trip abroad. It was not until Friday October 30, 2009 when I finally received your deposition notice finally fixing the categories. Almost all of these categories call for Mr. Amato's testimony.

Not only did the deposition notice then set the deposition for that very date I told you was not workable, you waited until last Friday, to do so. I since have given you alternative dates as I

Page -3-

Robert Collins, Esq.
LEWIS BRISBOIS BISGAARD & SMITH, LLP
November 9, 2009

stipulation and executed Court order.

Finally regarding the deposition schedule, and the lack of conference room availability to accommodate the parties in my office building, the following depositions will proceed at Dokich Court Reporters, 19712 MacArthur Boulevard, Suite 100, Irvine, CA 92612, (949)222-1131:

November 17, 2009 at 9:30 a.m.          Deposition of Carter Lee

November 18, 2009 at 9:30 a.m.          Deposition of Angela Delatore

November 18, 2009 at 9:30 a.m.          Deposition of Tracy Cogswell

Enclosed herein are the notices of change of location for the depositions of Carter Lee and Angela Delatore, along with the deposition notice for Tracy Cogswell and Marcus King.

**Meet & Confer re Summary Judgment of EWI.** As for the Summary Judgment, you are correct that Premier's claims for compensation arising from the EWI Blue Sky Cellar project is comprised of unjust enrichment in the sum of the profits earned by EWI on that project using the Cogswell sketches in question. During that discussion I cited to you and Mr. DeCarlo five (5) cases holding that under historically-settled California common law, unjust enrichment for misappropriation of intellectual property is properly measured by the profits of the misappropriation. You were unable to cite me any authority holding to the contrary, except for statute itself, which clearly authorized the remedial recovery of unjust enrichment. I requested case authorities, but to date, I have yet to receive any.

I also asked you for case authority supporting your position that Premier's copyright claims against parties *other than EWI* somehow preempted UTSA claims against EWI. Other than citing the statute itself, you were unable to offer any authorities for this proposition, but promised to send me some. I am still waiting.

Next, you claimed that the sketch could not be a trade secret by its nature. I suggested you look at the definition of trade secret under Civ.C. § 3426.1(d), which I will cite for you here:

Page -7-

Robert Collins, Esq.
**LEWIS BRISBOIS BISGAARD & SMITH, LLP**
November 9, 2009

advise you that your proposed summary judgment motion appears at this time to be unfounded and unsupported by any facts or case authorities thus far. This is further exemplified by the fact that, despite Mr. De Carlo's pledge to send the "authority" supporting his "positions" which he pledged to furnish, nothing whatsoever has since followed. As a result, I am left to suspect that the threatened motion is simply a thinly-veiled effort to harass my client and drive up unnecessarily the costs of the litigation, by forcing Premier to defend against a frivolous but time-consuming motion.

Accordingly, should Premier be required to defend against and prevail on any such ill-taken motion, Premier will have little recourse but to seek Rule 11 sanctions for Premier's expenses incurred in doing so.

Of course, should you have any genuine valid factual or legal basis for such a motion which you have not yet disclosed, I invite you to do so as part of your obligations genuinely to meet and confer prior to filing such motion under Local Rule 7-3.

With kind regards,

Laura M. Knox-Raphael,
THE KNOX ~ RAPHAEL LAW FIRM

Enclosures as Indicated

Cc:   John Selbak, Esq.
      [Via email and regular mail]

      Lisa Borodkin, Esq.
      [Via email]